# EXHIBIT 2-A

# POLICE DEPARTMENT, COUNTY OF NASSAU, N.Y.
## SUPPORTING DEPOSITION

INSTRUCTIONS: Deponent must place signature immediately after his/her narrative statement which shall include a statement of non-permission when applicab
Police Officer will complete boxed area of form and will witness the deponent's statement by placing signature immediately below the deponent's signature.

| Case Report No. | D.D. No. | | Defendants Name If Known | | Relationship of Deponent to Property |
|---|---|---|---|---|---|
| 206CR002557 | 3-167-06 | | | | |
| **Date & Time of Deposition** | **WITNESS** | **Rank** | **Name Printed** | **Serial No.** | **Command** |
| 1/9/06 1715 | | PO | THIEL | 8014 | 3 |

**NOTICE**

**ANY FALSE STATEMENT MADE IN THIS DEPOSITION IS PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW.**

I am EDWARD P. JENKS JR I have read and understand the above notic

On the 29 day of NOVEMBER 19 05 at about 1000 ☑AM ☐PM I DROVE MY 1985 MERCEDES BENZ MODEL 380 SL 2DR SD COLOR WHITE NY REGISTRATION BPH6861 IN EURO CARE LOCATED AT 657 WILLIS AVE IN WILLISTON PARK. I WAS WAITING FOR A PART TO BE ORDERED TO FIX MY VEHICLE. ON JANUARY 9, 2006 AT APPROX 300PM I WAS TOLD ~~B~~ BY THE OWNER ALEX ESQUIVEL THAT THE CAR WAS MISSING. I DID NOT GIVE ANYONE PERMISSION ~~THE~~ TO REMOVE THE VEHICLE AND I AM HAVING PO THIEL WRITE THIS STATEMENT FOR ME AND IT IS THE TRUTH

x Edward P Jenks

PO Scott C. Thiel *2377

(Continued on reverse side)

# EXHIBIT 2-B

POLICE DEPARTMENT, COUNTY OF NASSAU, N.Y.

## SUPPORTING DEPOSITION

INSTRUCTIONS: Deponent must place signature immediately after his/her narrative statement which shall include a statement of non-permission when applica
Police Officer will complete boxed area of form and will witness the deponent's statement by placing signature immediately below the deponent's signature.

| Case Report No. | D.D. No. | Defendants Name If Known | Relationship of Deponent to Property |
|---|---|---|---|
| 206CR002557 | 3-167-06 | | |

| Date & Time of Deposition | WITNESS | Rank | Name Printed | Serial No. | Command |
|---|---|---|---|---|---|
| 1/9/06 1720 | | PO | THIEL | 8014 | 3 |

**NOTICE**

**ANY FALSE STATEMENT MADE IN THIS DEPOSITION IS PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW.**

I am ALEX ESQUIVEL I have read and understand the above noti

On the 9 day of JANUARY 19 06 at about 300 ☐AM ☑PM I AM THE OWNER OF EURO CAR LOCATED AT 657 WILLIS AVE IN WILLISTON PARK. ON THIS DATE CUSTOMER EDWARD P. JENKS JR. CAME INTO PICK UP HIS 1985 MERCEDES BENZ MODEL 380 SL 2DR WHITE NY REGISTRATION BPH6861. WHEN I CHECKED MY YARD I DISCOVERED ~~AT~~ THE VEHICLE WAS MISSING. I CHECKED MY DIGITAL COMPUTER SURVEILANCE CAMERA I OBSERVED A MALE WHITE APPROX 32 YRS OF AGE ON DECEMBER 17, 2005 AT APPROX 1:52 AM ON MY PROPERTY OPEN THE DOOR OF ANOTHER VEHICL AND THEN WALK ON THE SIDE OF MY BUILDING AND THEN SAW THE ABOVE VEHICLE BEING DRIVEN AWAY WITHOUT PERMISSIO OR AUTHORITY. THE SUBJECT I BELIEVE TO BE MARTIN WESLEY OF 717 WILLIS AVE APT 7A WILLISTON PARK. THIS SUBJECT FREQUENTLY COMES INTO MY SHOP. I DID NOT GIVE MARTIN WESLEY PERMISSION TO REMOVE THIS VEHICLE AND I REQUEST THAT HE BE ARRESTED. I AM HAVING PO THIEL WRITE THIS STATEMENT FOR ME AND IT IS THE TRUTH. X [signature]

PO Acct C/Thiel #2377

(Continued on reverse sid

# EXHIBIT 2-C

#716

DISTRIBUTION
ORIGINAL - COMMAND
COPY - CRIMES AGAINST PROPERTY SQUAD

# POLICE DEPARTMENT, COUNTY OF NASSAU, N.Y.
## SUPPORTING DEPOSITION MOTOR VEHICLE, BOAT AND REGISTRATION PLATES

PDCN 36 - REV. 5/01

| VEHICLE THEFT SQUAD NO. | ALARM NO. | D.D. NO. | CASE REPORT NO. | C.B. NO. |
|---|---|---|---|---|
| | | | 2006CR0002557 | |

**REPORTED BY**

| NAME | HOME TELEPHONE NO. | BUSINESS TELEPHONE NO. |
|---|---|---|
| EDWARD P. JENKS JR | 902-9011 | 741-2920 |

| ADDRESS: NO. STREET | VILLAGE/HAMLET | STATE | ZIP CODE |
|---|---|---|---|
| 111 BROADWAY | EAST HAMPTON | NY | 11937 |

| DATE OF BIRTH | DATE AND TIME VEHICLE LAST OBSERVED | DATE AND TIME VEHICLE WAS DISCOVERED MISSING |
|---|---|---|
| 12/2/57 | 12/1/05 1600 | 1/9/06 1500 |

**IN LEGAL CUSTODY OF**

| NAME | HOME TELEPHONE NO. |
|---|---|
| ALEX ESQUIVEL | 631-581-2904 |

| ADDRESS: NO. STREET | VILLAGE/HAMLET | STATE | ZIP CODE |
|---|---|---|---|
| 140 STACOM ST | BAYSHORE | NY | 11717 |

| STOLEN FROM (Specify exact location) | POST NO. |
|---|---|
| 657 WILLIS AVE WILLISTON PARK | 305 |

**OWNER**

| NAME | HOME TELEPHONE NO. | BUSINESS TELEPHONE NO. |
|---|---|---|
| REPORTER | | |

| ADDRESS: NO. STREET | VILLAGE/HAMLET | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| DATE OF BIRTH | OCCUPATION |
|---|---|
| | ATTORNEY |

**MOTOR VEHICLE**

| LICENSE PLATE NO. | STATE | EXPIR. DATE | TYPE | V.I.N. NO. | YEAR |
|---|---|---|---|---|---|
| BPM6861 | ☑ N.Y. ☐ OTHER | 5/06 | PAS | WDBBA45C6FA02448 | 85 |

| MAKE | MODEL | STYLE | COLOR | MILEAGE | PRESENT VALUE |
|---|---|---|---|---|---|
| ME/BE | 380 | 2DSD | WHITE | 130,000 | 12,000 |

| WEAPON IN VEHICLE | OTHER IDENTIFING FEATURES, DAMAGE, ETC. |
|---|---|
| ☐ YES ☑ NO | |

| DATE VEHICLE PURCHASED | WHERE PURCHASED (Dealer) | VEHICLE COST |
|---|---|---|
| 1993 | PRIVATE | 20,000 |

**BOAT**

| REGISTRATION NO. | STATE | EXPIR. DATE | OUTER HULL MATERIAL | BOAT HULL NO. |
|---|---|---|---|---|
| | ☐ N.Y. ☐ OTHER | | ☐ WOOD ☐ METAL ☐ PLASTIC ☐ OTHER | |

| PROPULSION | MAKE | TYPE OF BOAT | LENGTH | COLOR | NAME OF BOAT |
|---|---|---|---|---|---|
| ☐ SAIL ☐ INBOARD ☐ OUTBOARD | | | | | |

| MAKE OF MOTOR | MODEL OF MOTOR | HORSEPOWER | SERIAL NO. | OTHER IDENTIFYING FEATURES |
|---|---|---|---|---|
| | | | | |

**INSURANCE**

| NAME OF INSURANCE COMPANY | POLICY NO. | HAVE YOU FILED AN INSURANCE CLAIM? | DO YOU PLAN TO? |
|---|---|---|---|
| GEICO | 645-41-19 | ☐ YES ☐ NO | ☐ YES ☐ NO |

**MISCELLANEOUS**

| WAS VEHICLE LOCKED AND SECURE? | WAS KEY IN VEHICLE? | IS VEHICLE USED FOR TRAVELING TO AND FROM WORK? | DO YOU HAVE KEYS TO VEHICLE? | DOES VEHICLE HAVE ORIGINAL ENGINE AND TRANSMISSION? | COMBAT AUTO THEFT STICKER ON VEHICLE? |
|---|---|---|---|---|---|
| ☑ YES ☐ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☑ YES ☐ NO | ☐ YES ☑ NO |

| NAME OF LAST DRIVER OF VEHICLE | NAME(S) OF LAST PASSENGER(S) IN VEHICLE | WATCH YOUR CAR INTERNATIONAL STICKER ON VEHICLE? |
|---|---|---|
| | | ☐ YES ☑ NO |

| WATCH YOUR CAR NIGHT STICKER ON VEHICLE? | ANTI-THEFT DEVICE INSTALLED? | LOJACK INSTALLED IN VEHICLE? | GPS ON VEHICLE? | WAS VEHICLE VIN ETCHED? | HAVE YOU FILED AN INSURANCE CLAIM FOR THE PERSONAL PROPERTY? | DO YOU PLAN TO? |
|---|---|---|---|---|---|---|
| ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO |

| VEHICLE PURCHASED? | HAS THIS VEHICLE EVER BEEN INVOLVED IN AN ACCIDENT? | DATE OF ACCIDENT | LAST TRIP MADE WITH VEHICLE |
|---|---|---|---|
| ☐ NEW ☑ USED | ☐ YES ☑ NO | | |

| HAS THIS VEHICLE BEEN RECENTLY REPAIRED? | WAS REPAIR WORK DONE ON? | DATE OF REPAIR | LOCATION |
|---|---|---|---|
| ☐ YES ☐ NO | ☐ BODY ☑ MECHANICAL | | EURO CAR 657 WILLIS AV WP |

DESCRIBE ACTIVITY WITH VEHICLE IN LAST 48 HOURS?
PARKED AT REPAIR SHOP

DESCRIBE ANY PERSONAL PROPERTY LEFT IN VEHICLE?

**I certify that I gave no one permission to take, obtain, operate, exercise control over, ride in or otherwise use the above mentioned Motor Vehicle - Boat - Registration Plates and the information contained in this instrument is true; I understand that any false statements made herein are punishable as a Class A Misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York. I understand that this report will be presented to my insurer upon receiving the appropriate request of such insurer.**

| SIGNATURE OF DEPONENT | DATE | TIME | PLACE |
|---|---|---|---|
| X Edward P Jenks Jr. | 1/9/06 | 1700 | 657 WILLIS AVE |

| WITNESS | RANK | LAST NAME | FIRST | SERIAL NO. | COMMAND |
|---|---|---|---|---|---|
| | PO | THIEL | SCOTT | 8674 | 3 |

# EXHIBIT 2-D

POLICE DEPARTMENT
County of Nassau

## NOTIFICATION OF RIGHTS
## PRIOR TO CUSTODIAL INTERROGATION

Before asking you any questions you should understand you have the right to remain silent and that any statements you make may be used against you in court. Also, you have the right to talk to a lawyer before answering any questions or to have a lawyer present at any time.

If you cannot afford to hire a lawyer, one will be furnished you, if you wish, and you have the right to keep silent until you have had a chance to talk with a lawyer.

Do you understand? x Yes Wes Martin

Now that you understand, are you willing to answer questions before talking with a lawyer or having one present? x

Yes Wes Martin

## NOTIFICATION OF RIGHTS

## ACKNOWLEDGEMENT AND WAIVER
## CUSTODIAL INTERROGATION - WRITTEN STATEMENTS

I have been told by the (Detective-Police Officer) that I have the right to remain silent and that any statements I make may be used against you in court. I have been told that I have the right to talk with a lawyer before answering any questions or to have a lawyer present at any time. Further, I have been advised that if I cannot afford to hire a lawyer, one will be furnished me and I have the right to keep silent until I have had the chance to talk with a lawyer.

I understand my rights and make the following statement freely and voluntarily. I am willing to give this statement without talking with a lawyer or having one present.

PDCN 233 Wes Martin

Det. Charles Ober Shield 1017. 01-16-06 1700

# EXHIBIT 2-E

Date JANUARY 16, 2006

Arrest # 206AR0000920

Det Div.# 3-167-06

Case Report # 206CR

My name is Wesley A. MARTIN, I am 34 years old having been born on July 30, 1971, I reside at 717 Willis Ave. Apt 7A. in Williston PARK. New York 11596

My Telephone Number is 646-510-4672 and I am employed by ARISTON Florist as a/an Delivery Person.

I have been told by the ☒ Detective ☐ Police Officer that I have the right to remain silent and that any statements I make may be used against me in court. I have been told that I have the right to talk with a lawyer before answering any questions or to have a lawyer present at any time. Further, I have been advised that if I cannot afford to hire a lawyer, one will be furnished me free of charge and I have the right to keep silent until I have had the chance to talk with a lawyer.

I understand my rights and make the following statement freely and voluntarily. I am willing to give this statement without talking with a lawyer or having one present.

About A month AGO, in December 2005, I WAS hanging out AT EURO-CAR on Willis Ave. The ~~spo~~ WAM shop is owned by Alex Esquivel. He is A FRIEND OF mine. While he stepped AWAY FROM his desk, I stole A set of Keys FROM behind The counter. The Keys WERE FOR A Mercedes-Benz That WAS PARKED in FRONT OF his shop. LATER THAT night, AFTER midnight, I WAlKed Down Willis Ave. and Looked Around Alex's LOT TO see if The COAST WAS clear. I Then WAlKed Around The CAR and unlocked The door with IT's Keys. I STARTED The CAR up. I Then bAcked The CAR up And drove The CAR AWAY. I DROVE UP And down Willis Ave. I WAS Also in The Roslyn Heights AREA. Eventually I SAW A Police OFFicer by The WAldbaum's Shopping Center.

I am at the 3RD SQUAD where I am giving this statement to a ☒ Detective ☐ Police Officer who is typing it for me and I have read it and it is the truth.

Witness Det Charles [signature] Sh 10 1017 Signature x [signature]

Witness ____________________

JetForm

Date JANUARY 16, 2006

Arrest # 206AR0000920

Det Div # 3-167-06

Case Report # 206AR

I Then became very PARANOID AND Nervous. I Then drove Through The back STREETS, so That The Police would NOT CATCH me. I Then parked The CAR on one OF The side STREETS. I Threw The Keys AWAY on one OF The STREETS. I Am very Sorry FOR WHAT I DID. I DID NOT intend TO hurt Anyone. I JUST WANTED TO TAKE The CAR FOR A LITTLE RIDE. I understand what I DID WAS wrong. This will never happen AGAIN. THIS STATEMENT IS The TRUTH X. [signature]

Det Charles Delise Sh no 1047

I am at the 3RD SQUAD where I am giving this statement to a ☒ Detective ☐ Police Officer who is typing it for me and I have read it and it is the truth.

Witness Det Charles Delise Sh no 1047 Signature x Wesley [signature]

Witness

# EXHIBIT 2-F

# NASSAU COUNTY POLICE DEPT

ARREST REPORT - 206AR0000920 MARTIN WESLEY A

Printed 01/16/2006-22:15 By 8082DECAR Page 1

**Sector 305 Level 9**

SECURESIGNED BY LT MICHAEL H MCGOVERN, 7017MCGOV ON 01/16/06 AT 22:10

*PERSONAL DATA*

Name MARTIN WESLEY A
Address 717 WILLIS AVE 7A WILLISTON PARK, NY 11596
Phone 646-510-4672
Born 07/30/1971 RVC
Age 34
SocSec 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
Marital Status S
CitizenShip US
OLN-St 134566158 NY
Agency#
State#
FBI#
Occupation DELIVERY PERSON
Employer / School ARISTON FLORIST
School-Grade 14
Description M WN 76 180
Eyes BROWN Glasses NONE
Hair SHORT STRAIGHT BROWN
Skin Complexion LIGHT Posture ERECT
Build SLIGHT Speech NORMAL
Nose LARGE Ears NORMAL
Mouth NORMAL Teeth NORMAL
Fingerprint#
Prob/Parole/Mental NO/NO/NO
Priors GRAND LARCENY,POSSESS STOLEN P
S.M.T/Clothing TAN JACKET,GREY SHIRT,BLUE JEANS,WHITE SNEAKERS
Gang ID How/By

*ARREST DATA*

Arrest# 206AR0000920
Alternate# DD3-167-06
Time Arrested 01/16/2006 16:20
How COMPLAINT
Arrested By 8082DECAR DECARO CHARLES 3SQ NY0290030
Hold For
Who Notified
Arrested Where 217 WILLIS AVE WILLISTON PARK
Sector 305
Time Booked 01/16/2006 16:40
Pod/Bed 10M / 05
Booked By 8082DECAR, 4020SVENT
Scheduled Release
Time Released
How
Released By
To Whom

**Sector 305 Level 9**
SECURESIGNED BY LT MICHAEL H MCGOVERN, 7017MCGOV ON 01/16/06 AT 22:10

*OFFENSES*

| | | | | | |
|---|---|---|---|---|---|
| 01/09/2006 17:00 | PENAL LAW, 155.35 GRAND LARCENY 3RD - MOTOR VEH | | | | FELONY (D) |
| Occurred Where | 657 WILLIS AVE WILLISTON PARK | | | | |
| Court | FIRST DISTRICT | | NOBOND | Return | 01/17/2006 |
| CR# | 206CR0002557 | NCIC | 2399 | Warrant/Docket# | |

*CONTACTS*

| | | | | | |
|---|---|---|---|---|---|
| FATHER | MARTIN MANNY | M W | DOB 07/11/1943 | SocSec | 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 |
| Address | 311 W 23 RD ST APT 5B NEW YORK, NY | | | Phone | 212-242-8524 |
| Comments | WAS CONTACTED BY DEFENDANT WHILE AT 3RD PCT. | | | | |

# EXHIBIT 2-G

# NASSAU COUNTY POLICE DEPT
## PHYSICAL CONDITION QUESTIONNAIRE -PDCN 79SJ

Printed 01/17/2006-03:20 By 6606DESIM Page 1

*CORE DATA*

Date Taken 01/17/2006-03:20
Taken Where DET DESK
Taken By 7622BRUNO
Presented By 8628BUDIM 8741ROBEY

Arrest# 206AR0000920
Detention# 547

Defendant MARTIN WESLEY A DOB 07/30/1971
Address 717 WILLIS AVE 7A WILLISTON PARK, NY 11596

Offenses 155.35/GRAND LARCENY 3RD - MOTOR VEH

---

Are You In Good Health? / Do You Need A Doctor?
YES/NO

Do You Have Any Injuries? / Describe? / How Received?
NONE

What And How Much Alcohol Did You Consume?
NONE

What Drugs Do You Use / When Last Used?
NONE

I have read the above questions and answers and certify that the answers are mine and that they are true.

Wesley A Martin

Signature of Defendant

---

Does Defendant Have Any Apparent Injuries?
N

Does Defendant Appear To Be In Good Health?
Y

Additional Supervisor Observations (Injuries, Treatment Demeanor etc.)
NONE 7115

Signature of Desk Officer

# EXHIBIT 2-H

# DISTRICT COURT -- FELONY COMPLAINT

Citation#
Arrest# 206AR0000920
Date / Time of Arrest 01/16/2006 at 16:20

CR# 206CR0002557
Return Date 01/17/2006
Court Docket ____________

DOB
07/30/1971
Age
34

Offense

155.35

GRAND LARCENY 3RD - MOTOR VEH

D
FELONY

Sector
305

Prepared By
4020SVENT

FIRST DISTRICT

THE PEOPLE OF THE STATE OF NEW YORK AGAINST

WESLEY A MARTIN
717 WILLIS AVE 7A
WILLISTON PARK NY 11596

IN THE STATE OF NEW YORK COUNTY OF NASSAU: DET CHARLES DECARO, SHIELD# \1047, BEING A MEMBER OF THE NASSAU COUNTY POLICE DEPT DEPOSES AND SAYS THAT ON OR ABOUT THE 9TH DAY OF JANUARY, 2006, AT ABOUT 5:00 PM, AT 657 WILLIS AVE WILLISTON PARK, THE DEFENDANT DID VIOLATE NEW YORK STATE PENAL LAWSECTION(s) §155.35 .

§ A person is guilty of grand larceny in the third degree when he steals property and when the value of the property exceeds three thousand dollars.

Grand larceny in the third degree is a class D felony.

TO WIT: At above time and place of occurrence Martin A Wesley stole property ,value of which exceeded Three Thousand Dollars.
The defendant previously stole the keys to a 1985 Mercedes Benz Reg.BPH6861 from Euro Car Repair Station located at above address.
On the above date ,the defendant utilized those keys and stole that automobile. This vehicle. is valued at approximately $5,000 and had been previously left by the victim at the shop to be repaired.

The above is based on information and belief, the source of said information and basis for said belief being the interviews and statements of victim and witness and the collected evidence.

* ANY FALSE STATEMENT MADE HEREIN IS PUNISHABLE AS A CLASS A MISDEMEANOR, PURSUANT TO SECTION 210.45 OF THE PENAL LAW.

SUBSCRIBED BEFORE ME THIS
16TH DAY OF JANUARY 2006.

____________________
DET CHARLES DECARO

____________________
LT MICHAEL H MCGOVERN

# EXHIBIT 2-I

Sector 305 Level 6
SECURESIGNED BY LT MICHAEL H MCGOVERN, 7017MCGOV ON 01/09/06 AT 23:07

*CORE DATA*

Case Report# 206CR0002557
Other# DD3-167-06 RD
Master CR#

Classification 155.35 GRAND LARCENY 3RD - MOTOR VEH
Ranking FELONY

Reported As GRAND LARCENY
Time Reported (MON) 01/09/2006 17:31
Taken By 4775CYARD
Reported How 911

Time of Occurrence 12/17/2005 01:52 (SAT) To

Injuries N
Weapons N
Stolen Property$ Stolen Vehicle$ $12000.00
Damaged Property$ Damaged Vehicle$

Scene 657 WILLIS AVE WILLISTON PARK
Sector 305
Premise 48

Time Dispatched 01/09/2006 16:23 (MON)
Time On Scene 01/09/2006 16:29 8014THIEL THIEL SCOTT C
Time Cleared Scene

Assigned To 3SQ 8082DECAR
Cleared

*MORE CORE*

Pattern

Time-Of-Day U
Weather Condition U

Forms Prepared 36 32B

| MO-Code | Description | Comments |
|---|---|---|
| SA | STOLEN AUTO | |

*MEMBERS*

ASSIGNED DECARO CHARLES (8082DECAR)

*OFFENSES*

01/09/2006 17:00 PENAL LAW, 155.35 GRAND LARCENY 3RD - MOTOR VEH FELONY (D)
Arrest# 206AR0000920

12/17/2005 01:52 PENAL LAW, 155.35 GRAND LARCENY 3RD - MOTOR VEH FELONY (D)
Arrest#

Sector 305 Level 6
SECURESIGNED BY LT MICHAEL H MCGOVERN, 7017MCGOV ON 01/09/06 AT 23:07

*NAMES*

ARRESTEE MARTIN WESLEY A M WN 76 180 DOB 07/30/1971 SocSec U
Address 217 WILLIS AVE 7A WILLISTON PARK, NY 11596 Home Phone
Employer Occupation Work Phone
State#/NCIC# / Arrest# 206AR0000920 Deposed N
Gang ID How/By

OTHER EURO CAR INC DOB SocSec
Address 657 WILLIS AVE WILLISTON PARK, NY Home Phone
Employer Occupation Work Phone
State#/NCIC# / Arrest# Deposed N
Gang ID How/By

OTHER ESQUIVEL ALEX M WH DOB U SocSec U
Address 140 STACOM ST BAYSHORE, NY Home Phone 631-581-2904
Employer Occupation OWNER Work Phone
State#/NCIC# / Arrest# Deposed Y
Gang ID How/By

SUSPECT WESLEY MARTIN M WN DOB U SocSec U
Address 717 WILLIS AVE APT 7A WILLISTON PARK, NY Home Phone
Employer Occupation Work Phone
State#/NCIC# / Arrest# Deposed N
Gang ID How/By

VICTIM JENKS JR EDWARD P M WN DOB 12/02/1957 SocSec U
Address 111 BROADWAY EAST HAMPTON, NY 11937 Home Phone 516-902-9011
Employer Occupation ATTORNEY Work Phone 516-741-2920
State#/NCIC# / Arrest# Deposed Y
Gang ID How/By

*ROPERTY*

EVIDENCE OTHER PROPERTY Qty 1 Value $1.00
Description SIGNED 32B TAKEN FROM OTHER ALEX ESQUIVEL
Make Model Evidence#
SerialNo OwnerNo State#/NCIC# /

EVIDENCE OTHER PROPERTY Qty 1 Value $1.00
Description SIGNED 32B AND 36 TAKEN FROM VICTIM EDWARD P JENKS JR
Make Model Evidence#
SerialNo OwnerNo State#/NCIC# /

Sector 305 Level 6
SECURESIGNED BY LT MICHAEL H MCGOVERN, 7017MCGOV ON 01/09/06 AT 23:07

*'EHICLES*

| | | | |
|---|---|---|---|
| STOLEN | BPH6861 NY | Value | $12000.00 |
| Make | 85 MEBE 380S 2DR WHITE | VIN | WDBBA45C6FA02448 |
| Registered To | JENKS JR EDWARD P | State-Entry# | LNAC466 |
| Address | 111 BROADWAY EAST HAMPTON, NY 11937 | NCIC-Entry# | |

*'RELIMINARY WRITTEN BY 8014THIEL ON 01/09/2006*

Victim Edward P Jenks Jr reports bringing listed car to Other Euro Car Inc for service on 11/23/05. The car was awaiting order for a special part. On 01/09/06 Victim was informed by owner of shop Other Alex Esquivel that his vehicle was missing from his shop. Other Alex Esquivel checked his digital computer surveillance camera and observed a male white who he believes to be Suspect Martin Wesley on 12/17/05 at 0152 hours on his property opening a car door of another vehicle. Suspect was then seen walking around side of building. The listed vehicle is seen driving away. Victim request an arrest. 3rd Squad notified. Repo check negative. Operator #416.
RMP 305

*'D NARRATIVE WRITTEN BY 8082DECAR ON 01/10/2006*

Notification

I was notified of this case by P.O. Thiel in person on January 9,2006 at the 3rd Sqd.

Defendant

Wesley A. Martin DOB 07/30/1971
717 Willis Ave APT 7A
Williston Park ,New York 11596
(646)510--4672

Charged//Booked

The defendant was charged with one count of Grand Larceny 3rd (PL 155.35)

Prints//Photos

I secured both at the 3rd Pct Sths.

Statement

The defendant waived his rights and gave a statement of admission which I reduced to writing.

Complainant

Edward P. Jenks Jr. DOB 12/02/1957
111 Broadway
E. Hampton,NY 11937
(516)902-9011 home, (516)741-2920work

Place of Occurrence

Euro Car Inc
657 Willis Avenue

*D NARRATIVE WRITTEN BY 8082DECAR ON 01/10/2006 (continued...)*

WillistonPark,NY
(516)741-8181
Owner:Alex Esquivel

Vehicle

1985 Mercedes Benz 380 SL 2DSD Color white
NY Reg BPH6861 Vin no. WDBBA45C6FA02448

Resume

On January 9, 2006 the complainant Edward P. Jenks Jr. received a phone call from Alex Esquivel, owner of Euro Car Inc, a foreign car repair shop which is located at 657 Willis Avenue in Williston Park, New York. Mr. Esquivel stated that the complainant's automobile, a 1985 Mercedes Benz 380 SL 2DSD NY Reg BPH6861 which was awaiting repair at his shop, was no longer there. Neither were the vehicles keys. The complainant responded to the repair shop. Meanwhile, Mr. Esquivel was able to locate video footage from his store's security system showing a male white walking back and forth in front of his repair shop and then enter the complainant's automobile. The male then drove the vehicle off of the lot. The video footage was from December 17,2005 at approximately 0150 hours. Mr. Esquivel recognized the male that was walking and seen removing the complainant's automobile from his shop's lot. The male is known to Mr. Esquivel to be Wesley Martin of 717 Willis Avenue Apt 7A. This male frequents the repair shop on a regular basis, and has been doing so for approximately three (3) years now. On January 12, 2006, the complainant's vehicle was recovered by the Nassau County Police Dept , 3rd Pct Police Officers and was impounded (HQ -10-06). NCPD Electronics Squad Detectives were notified and responded to secure the video footage.

On January 16, 2006, Third Squad Detectives De Caro and Sventoraitis located Wesley Martin on Willis Ave and Syracuse St in Williston Park. The male was placed under arrest and transported to the 3rd Squad for investigation While at the 3rd Squad, the defendant gave a statement of admission detailing the larceny of the automobile and how he stole the vehicle's keys earlier that day (December 16,2005) from the repair shop's office.

Arraignment

January 17,2006 First District Court, 99 Main St. Hempstead,NY

Case Status

Closed (Code 01

---

Detective Charles De Caro 3rd Squad Shield No. 1047

# EXHIBIT 2-J

**DISTRICT ATTORNEY ARRAIGNMENT FORM**

Wesley A. Martin (34)

DEFENDANT (S)

DP 155.3- 85 [illegible]

CHARGES

| 10K / 5K 250 | 9 | 1/15/06 |
|---|---|---|
| BAIL RECOMM./BAIL SET | ADJOURN PART | ADJOURN DATE |
| CPL 710.30 & 250.20 Notice (Notice and Demand) | 2302 PHL Exam (Prostitute) | Defendants Demand |
| Lic Suspended-Refusal and/or Prior Convict. within 5 yrs. | 730.30 Exam (Mental Disease or Defect) | Atty. Notice of Appearance |
| | Stolen Prop. Release Form | T.O.P. Served |

BAIL CONSIDERATIONS:
(circle as applicable)

Priors/No Priors [illegible]

Resident/Non Resident

Citizen/Alien

Violent/Non Violent

Drug User/Non Drug

Employed/Unemployed

Felony/Misdemeanor

DWI/DWAI:

Reading ____________%

Refusal ____________

Accident/No Accident

Prior Conviction ____________

Domestic Violence ____________

Family Offense ____________

[signature]
Assistant D.A.

Janowitz
Judge

1/17/06 — Date

AA — Part

DA - 1362. 6/76 Rev. 1/97

# EXHIBIT 2-K

DISTRICT COURT : COUNTY OF NASSAU
CRIMINAL PART 9

THE PEOPLE OF THE STATE OF NEW YORK

Wesley Martin

-against-

DEFENDANT.

**SHORT FORM ORDER**
CPL §180.50 REDUCTION

Felony Comp. No.: 001100/06

1. On 5/25/06 the Court, after inquiry, orders the reduction of the felony offense(s) listed in the above-referenced felony complaint to a non-felony offense(s).

2. The Court is satisfied that for each felony offense, there is a reasonable cause to believe that the defendant committed an offense other than a felony and for each felony offense:

   - ☐ There is not reasonable cause to believe that the defendant committed a felony in addition to the non-felony offense, or
   - ☑ Although, there is reasonable cause to believe that the defendant committed a felony in addition to the non-felony offense, the Court is satisfied that a reduction of the felony offense is in the interest of justice and the District Attorney consents to the reduction.

3. Pursuant to CPL §180.50(3):

   - ☐ The District Attorney is directed to file a prosecutor's information; or
   - ☐ The complainant is requested to file
     ☐ an information ☐ a misdemeanor complaint; or
   - ☑ The Court shall convert felony complaint or copy thereof through notations to
     ☐ an information ☑ a misdemeanor complaint.

4. Upon the filing of the information, prosecutor's information or misdemeanor complaint the felony charge of:

| | | |
|---|---|---|
| 155.35 | is reduced to a non-felony charge of | 155.25 |
| | is reduced to a non-felony charge of | |
| | is reduced to a non-felony charge of | |
| | is reduced to a non-felony charge of | |
| | is reduced to a non-felony charge of | |

and the felony complaint is dismissed.

Dated: 5/25/06

ENTER:
Lea Ruskin
J.D.C.
HON. EDWARD A. MARON

M-3475 9/99

# EXHIBIT 2-L

DISTRICT COURT OF NASSAU COUNTY
FIRST DISTRICT: PART C-12

---------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

Index NAOO1100

-against-

Huntley, Dunaway Hear

WESLEY MARTIN,

Defendant.

---------------------------------------X

99 Main Street
Hempstead, N.Y. 11550

March 1, 2007

B E F O R E: HON. ERICA L. PRAGER
District Court Judge

A P P E A R A N C E S:

For the People KATHLEEN M. RICE, ESQ.
Nassau County District Attorney
BY: CATHERINE HENRY, ESQ.
Assistant District Attorney

For the Defendant JOHN CARMAN, ESQ.
666 Old Country Road
Garden City, New York

ANDREA RASO
Official Court Reporter

THE CLERK: Add on, Wesley Martin, Part five case being heard in Part 12, on for a Huntley, Dunaway, 2006NA001100.

People ready?

MS. HENRY: Catherine Henry DA Law Assistant to the People.

The People are ready.

MR. CARMAN: John Carman, 666 Old Country Road, Garden City, for Mr. Martin. The defendant is ready. Let the record reflect that Rosario material was handed up by the People.

THE COURT: Do you want to put the Rosario material on the record or do you want to just rely on the cover page?

MS. HENRY: Rely on the cover page but add, for the record, that additionally handed over was a copy of the Miranda card and a copy of the detective's log books, in addition to what is listed on the cover page.

MR. CARMAN: I think that accurately describes the Rosario packet.

THE COURT: Okay, ready to proceed?

MS. HENRY: Your Honor, this hearing was stipulated to by the People. It is limited to

the issues of probable cause for the arrest of the defendant and to the issue of whether the written statement made by the defendant was voluntary and free of classic coercion in violation of this Court's and the defendant's Fifth Amendment right. We are litigating the written statement of admission made by the defendant, Wesley Martin, to Detective Decaro, on January 16th, 2006.

The People call Detective Decaro to the stand.

C H A R L E S D E C A R O, Detective, witness called after having been first duly sworn and having stated his shield as 1047 and his command as Third Squad, Nassau County Police Department, took the witness stand and testified as follows:

DIRECT EXAMINATION:

Q Where do you work?
A Nassau County Police Department.
Q How long have you worked for the Nassau County Police Department?
A Since August 15th of '97.
Q What is your present command?
A Third Squad.
Q What are your duties with the Nassau

County Police Department?

A Detective assigned to the Third Squad, investigating crimes that occur within the confines of the Third Precinct and villages within the Third.

Q Can you describe any training that you received for this job?

A Training in the police academy, basic in-service training, and the investigators course in 2005 for detective.

Q How long have you been at your present command in the Third Precinct?

A Since I was assigned from the police academy in '98.

Q Over the course of your career approximately how many arrests have you made?

A Numerous.

Q Hundreds?

A Many, yes.

Q Detective, directing your attention to January 16th of '06 were you working as a detective on that day?

A Yes.

Q Did you become involved in an investigation on that date?

A Yes.

Q What was the nature of that investigation?

A A few days prior I was assigned to a case for a stolen car that occurred at Euro Car Inc. on Willis Avenue.

Q Do you remember what date that was assigned?

A I believe January 9th. I would have to check. I believe it was January 9th of '06.

Q Beginning with January 9th and the start of your investigation how did you begin the investigation in this case?

A I contacted the complainant, the owner of the establishment, as well as the owner of the vehicle.

Q What, if any, information did you receive from the owner of Euro Car?

A Euro Car Inc, I spoke to him. He informed me that a customer of his, Mr. Edward Jenks, had a car in there for repair, I believe, for a few months. I would say around Thanksgiving in '06. The vehicle was there for an extended period of time.

Q So no one is confused I believe it is '05?

A I apologize it is '05.

THE COURT: The car has been in the shop?

THE WITNESS: The car was in the shop around Thanksgiving of '05. They were trying to locate a piece. It was an older model Mercedes Benz. Around January 9th Mr. Jenks and his wife drove by the place and noticed the car was not there. He called up Alex, the owner, to find out if the car was inside, where it was, the whereabouts of his car, whether it was finished or they located the piece. And at that time Alex told him they didn't know where the vehicle was. He then went through his computer digital video system, and that is when he discovered that the vehicle was missing.

Q Referring to the store's video system did you have an opportunity to view the system from those dates?

A Yes. On that date, I believe it was the 16th, I went out to Euro Car Inc. And on their computer with the owner Alex--

Q Detective, you were saying it was January 16th. You had an opportunity to view that tape from the security tape?

A Prior to our encounter with the defendant.

Q What was the content of that tape?

A An interior and exterior shot of Euro Car

Inc, Willis Avenue, mainly the office where the register is, the front waiting room is, as well as, the exterior, the perimeter shot on Willis Avenue where the cars are parked behind the gates.

MS. HENRY: Your Honor, the People have handed up a copy of the contents and we would like to move--

THE COURT: You are marking it for I.D?

MR. CARMAN: Your Honor, I think it needs to be marked for I.D. I don't object. I don't object to it going into evidence. It should go into evidence.

THE COURT: People's one in evidence.

(People's 1 was marked into Evidence)

MS. HENRY: At this time we would like to view the video if the detective would step down.

Your Honor, do you want to view the video in its entirety and have the detective describe it?

THE COURT: It's in evidence.

Mr. Carman, do you have any objection to it?

MR. CARMAN: However she chooses to do it is fine with me. I would like to watch it with

the detective if he points stuff out.

THE COURT: Absolutely. It is totally up to you Miss Henry.

MS. HENRY: It would be appropriate for the detective to describe it for us. We will watch it and he will point things out.

(Videotape being viewed)

Q Can you tell us what that scene is?

A This is the front waiting room of Euro Car Inc. This would be the counter area of the register and the seats where the customers would wait.

Q Is that the video that you watched on January 16th with the owner of Euro Car Inc.?

A Yes.

Q Detective, for the record, can you tell us what date that video was taken?

A It looks like December 16th, 2005, at approximately 1730 hours. Right now as the tape is running--

Q That is the end of that video?

A Of that clip, yes.

Q Detective, what's in this screen?

A More interior shots with the defendant, Mr. Martin--

MR. CARMAN: Can I ask a few quick

questions? Right in the center of the screen, 1738, the person in the grey jacket, with the blue who do you believe that to be?

THE WITNESS: Mr. Martin.

MR. CARMAN: How do you know that?

THE WITNESS: After personally meeting Mr. Martin but also the owner, Alex. He is known to Alex for three years prior.

MR. CARMAN: So, when you watched the videotape with Mr. Esquivel that was the first time he had ever seen Mr. Martin, correct?

THE WITNESS: Yes.

MR. CARMAN: And the person with the blue, behind the desk who is that; is that Alex?

THE WITNESS: It looks like him. I don't know. It could be Alex or one of the employees.

MR. CARMAN: It is hard to see.

THE WITNESS: Yes.

MS. HENRY: May I continue with the next clip?

THE COURT: Yes.

MS. HENRY: What is this a shot of?

THE WITNESS: Camera five, December 17th, '05, 153 hours.

MR. CARMAN: What does that depict?

THE WITNESS: That is an exterior of the shop. It is a gated area out front, and on the side of Willis Avenue, the area the camera I guess spans the area that is not gated. Also the front of his shop.

MR. CARMAN: And it's clear that this camera shows, in part, at least a street that has traffic passing by.

What street is that?

THE WITNESS: In this view I don't know. In this traffic I am not sure which street it is from this camera. I can't tell if it is Willis or the side street because he is on the corner of Willis.

MR. CARMAN: Did you watch that videotape of Mr. Esquivel?

THE WITNESS: Yes, he showed me--

MR. CARMAN: Do you have any recollection of when you watched that video there was a person walking through the videotape. Did he identify that person?

THE WITNESS: There was another clip from an exterior shot at night.

MR. CARMAN: So, it is your recollection

or you have no recollection of whether he identified the person that just walked through the frame?

THE WITNESS: On this particular camera angle I don't remember.

MR. CARMAN: Do you have any report or note that tells you if he did that?

THE WITNESS: On this, no, not on the video.

MS. HENRY: Can you tell us what this is?

THE WITNESS: This is the corner of Willis Avenue, running north and south, and that is the side street of Euro Car Inc. This is the vehicle that is parked in front of the gate and a vehicle on the side.

THE COURT: That is not shown in this clip. What I am looking at right now is Willis Avenue?

THE WITNESS: Yes.

MS. HENRY: Is there an individual walking?

THE WITNESS: Yes.

MS. HENRY: And what is the date of this?

THE WITNESS: 12-17-05 approximately 1:47, camera six.

Q Did you view that with the owner of Euro Inc, Mr. Esquivel?

A Yes.

Q Did he identify the person in the clip?

A Yes.

Q And who did he identify that person to be?

A Wesley Martin.

Q How did he identify this person as Wesley Martin?

A The mannerisms, the jacket he was wearing.

Q Are Mr. Esquivel and Wesley Martin familiar with each other?

A Mr. Martin frequents the shop according to Mr. Esquivel for the three years prior, just hung around the shop and was interested in the cars that were there.

THE COURT: For how long?

THE WITNESS: Three years he is known to Alex, for approximately three years prior to this date according to Alex.

Q Detective, could you describe for us the rear, left corner of the shop; what's in that?

A These are the cars that are parked, customer's cars waiting for repair. Up here that would be north. This shot here is facing north on

Willis.

Q Do you know one of those cars to be owned by Mr. Jenks?

A Yes.

Q Do you know which one?

A The lighter one, white one, the Mercedes Benz.

MR. CARMAN: While we are waiting, detective, the video that we are watching I noticed that the second interval at times go by seconds and they seem to skip. Would it be fair to say it is not a movie quality presentation that Euro Car received from its video surveillance company? It's choppy. It is not realtime.

THE WITNESS: I am not familiar with the security system that they have. This is what was provided.

MR. CARMAN: Is it your opinion when you see a person walk across it is difficult to identify specific mannerisms due to the choppiness of the film?

THE WITNESS: To me, to myself, yes. That is the Mercedes Benz that you mentioned prior.

Q And, for the record, can you tell us what

happened in the video?

A The car was pulled out of a spot up here and drove past on the street.

Q When you watched the video with Mr. Esquivel did it also appear in this choppy manner as you described?

MR. CARMAN: I object to that.

THE COURT: Overruled.

A The actual footage on Alex's computer, on the system, was not as grainy. It was clear but it still had, the time was like broken up. It is just the quality of the picture seemed better but the time was still the same.

THE COURT: Did it have that it sometimes got lighter and sometimes gets dark like there.

THE WITNESS: Yes.

THE COURT: Are those headlights of cars passing by?

THE WITNESS: Yes, there is a Dairy Barn or store like Dairy Barn. There are stores right here and it is on the corner.

MR. CARMAN: Detective, the video we just watched was it a fair and accurate depiction or presentation of the video clip that you watched at Euro Car?

THE WITNESS: Yes, this is a copy of our electronic squad copies from Alex's hard drive. They responded to Euro Car because the--Electronic responded to Euro Car Inc. and had to make a copy on their equipment of the footage. Then they responded to Electronic Squad and they copied that footage to the disk. This is the original. This would be the original.

MR. CARMAN: So, it is your testimony that this rendition of the video is substantially similar to the video that you saw except for the graininess?

THE WITNESS: Yes.

MS. HENRY: I believe that we viewed all the clips.

THE COURT: I want to see the other portion with the car clips on it.

THE WITNESS: This is when the car is back out of the spot.

THE COURT: A couple of seconds before that.

THE WITNESS: Mr. Esquivel stated that this individual here that was coming up through this and around is Mr. Martin, and that

individual goes to these cars here, and that is when this car backs up and it is not recovered for at least a month later.

THE COURT: Let's go to when the car gets pulled out. Now, was this copy like this when you watched it?

THE WITNESS: The interior office. Yes, it was better.

MR. CARMAN: So, not so much this portion when it was darker?

THE WITNESS: It was clearer but it is still night time. It is night vision.

THE COURT: When Mr. Esquivel watched that portion of the tape and identified the defendant to you it was this copy?

THE WITNESS: Yes.

THE COURT: And was it this dark?

THE WITNESS: At times and at times it gets lighter. And the cars are turning off Willis, to the side street.

(End of viewing video)

CONTINUED DIRECT:

Q Officer, moving forward to January 16th, of '06, did--Actually I will go backwards between when you watched that video with Mr. Esquivel and

January 16th. What other stuff did you make in your investigation?

A I made numerous phone calls to Mr. Esquivel and Mr. Jenks trying to set up a common time that I can respond to review the video at Euro Car Inc. We just kept missing each other for a few days that I was working. And then I was able to have a electronics squad. They set up a time and date and responded to their facility to copy the footage of Mr. Esquivel.

Q After reviewing the video did you come to a conclusion as to who you believed committed the alleged crime?

A After reviewing it myself, after speaking with Mr. Esquivel, the business owner had an idea.

Q What factors lead you to that conclusion?

A Mr. Esquivel was adamant. He believed that Mr. Martin removed the keys from the office and then took the car.

Q Moving forward to January 16th of '06, did there come a time when you arrested an individual on that day?

A Yes.

Q Who did you arrest that day?

A Wesley Martin.

Q What time was that?

A The 16th. I'm sorry, I believe it was 1620 hours, 4:10 in the afternoon if I remember correctly.

Q Do you see the person you arrested in the courtroom today?

A Yes, ma'am.

Q Can you please point to him and identify an article of clothing?

A He is wearing the dark, colored suit and sitting next to counsel at the table.

MS. HENRY: Let the record reflect that the witness has identified the defendant.

THE COURT: Yes, the record shall so reflect.

Q Prior to you arresting--

THE COURT: Can I do a further I.D. of the shirt?

MS. HENRY: Yes, your Honor.

THE COURT: What color shirt?

THE WITNESS: White colored shirt with a black and grey striped tie, sitting to the right.

MR. CARMAN: I will stipulate to the I.D.

Q Where did you arrest the defendant?

A On the street, on Willis Avenue. I believe it was Willis Avenue and Syracuse Street, in Williston Park.

Q When you went to Willis Avenue, on that day, what was your reason for going to Willis Avenue on that day?

A First was to meet with Mr. Esquivel to view the video on his system since I had a problem playing it at the squad. I was unfamiliar with that video system. I never used that system prior, and then to talk to Mr. Esquivel because I got in touch with him and he was there and he was going to be around for a while.

Q What was your reason for going to Willis Avenue, at Williston Park, on that day?

A To talk to Mr. Esquivel, and after talking to him to try and locate and speak with Mr. Martin.

Q When you located Mr. Martin did you have any conversation with him at that point?

A He actually found us on Willis Avenue. We went to his apartment, Detective Sventoraitis and myself. No one was home. No one answered the door. There were men downstairs renovating the apartment. We told them who we were, left the card and told them if he comes home to give us a call, and we

walked down the hall to where a man was sweeping outside, and he was the caretaker for the property. And as we were talking to him Mr. Martin came walking down Willis Avenue towards us.

Q And at what moment did you place the defendant under arrest?

A After speaking to Mr. Martin for a few moments with Detective Sventoraitis.

Q Were you in uniform?

A No, just dress clothes. I don't know if it was a suit or sports jacket, not a uniform, plainclothes.

Q Did you identify yourself?

A Yes.

THE COURT: Did you identify yourself prior to arresting the defendant?

THE WITNESS: Yes.

Q Willis Avenue, at Williston Park, is that in the County of Nassau, State of New York?

A Yes.

Q And Euro Car Inc is located on Willis Avenue, in Williston Park, is that in the County of Nassau, State of New York?

A Yes, ma'am.

Q Detective, where, if anywhere, did you go

after you arrested the defendant?

A We then transported him to the Third Squad on Hillside Avenue and Williston Park.

Q After arriving at the Third Squad where, if anywhere, did you take the defendant?

A Up to the Third Squad and then into an interview room when it became available.

Q Was the defendant given his Miranda warnings?

A Yes, ma'am.

Q Do you recall when that was?

A It was on that day. For the time you would have to look at the actual card.

Q Is your memory exhausted as to--

A Yes.

Q What, if anything, would refresh your recollection?

A The Miranda card.

MS. HENRY: May I have this shown to the defendant?

THE COURT: We'll mark it as People's two for I.D. and show it to the detective.

MS. HENRY: Thank you.

THE CLERK: People's two for I.D. so marked, two pages.

(People's Exhibit 2 was marked for Identification)

THE COURT: Being shown to the defendant. Being shown to the witness.

A Okay.

Q Is your memory refreshed?

MS. HENRY: Can we have it removed from the witness.

Q Detective, can you answer the question about what time was the defendant given his Miranda warnings?

A On January 16th, 2006, 1700 hours, which would be five p.m.

Q And who gave the defendant his Miranda warnings?

A Myself along with Detective Sventoraitis.

MS. HENRY: Your Honor, what has been marked as People's two for I.D. can I have that shown to the witness again?

THE COURT: Being shown to the witness.

Q Detective, do you recognize this?

A Yes.

Q What do you recognize it to be?

A This is the rights card that I read to the defendant, Mr. Martin, that he answered yes to and

that is the card I saw him write the words yes and sign his name in the required spaces.

Q And is it in the same or substantially the same condition as it was on January 16th, 2006?

A This is a photocopy of the original, but this is a fair and accurate copy of the original.

MS. HENRY: Your Honor, the People move this photocopy of the Miranda card into evidence.

MR. CARMAN: No objection.

THE COURT: Thank you. People's two for I.D. now in evidence.

THE CLERK: In evidence, so marked.

(People's Exhibit 2 was marked into Evidence)

MS. HENRY: Can I have the exhibit shown to the witness again?

THE COURT: Mr. Carman, by the way, did you want to see it?

MR. CARMAN: No, your Honor. Thank you.

Q Detective, could you read the Miranda warnings as you read them to the defendant on January 16th, 2006?

A "Before asking you any questions you should understand that you have the right to remain

silent and that any statement you make maybe used against you in court. Also you have the right to talk to a lawyer before answering any questions or have a lawyer present at any time. If you cannot afford to hire a lawyer one will be furnished to you if you wish. You have the right to keep silent until you have had a chance to talk with a lawyer. Do you understand?"

Q And what, if anything, did the defendant do in response to the final question?

A He said he did understand. He wrote the word yes and signed his name, signed Wes Martin.

Q What, if anything, did you do next?

A I read the next caption, "Now that you understand are you willing to answer questions before talking with a lawyer or having one present?"

Q What, if anything, did the defendant do in response to that question?

A He acknowledged he did understand. He again wrote the word yes and signed Wesley Martin. Continue?

Q Yes please.

A "I have been told by the detective/police officer that I have the right to remain silent and any statement I make maybe used against me in court.

I have been told that I have the right to talk to a lawyer before answering questions or have a lawyer present at any time. Further I have been advised if I cannot afford to hire a lawyer one will be furnished to me and I have the right to keep silent until I have had the chance to talk with a lawyer. I understand my rights and make the following statement freely and voluntarily. I am willing to give the statement without talking to a lawyer and having one present." And the defendant signed his name Wesley Martin.

Q Is there anything further?

A Just my signature, time stamp, time and Detective Sventoraitis signature on the side.

Q What, if any, threat did you make to the defendant to get him to waive those rights?

A None.

Q What, if any, force did you use?

A None.

Q You stated that there was another detective present. What was his name again, Edward Sventoraitis?

A Yes, ma'am.

Q Did Detective Sventoraitis make any threats to the defendant to get him to waive those

rights?

A No.

Q And did Detective Sventoraitis use any force with the defendant to have him waive those rights?

A No, ma'am.

Q What happened after the defendant signed the rights card?

A I secured a written statement from the defendant.

Q What threats, promises or force did you use to procure that statement?

A None, no threats, promises or anything of that nature.

Q Was that statement given orally or written?

A I wrote down the statement after speaking to the defendant. His statement was reduced to a writing.

Q How did you put it into writing?

A Sum and substance during the conversation we had we wrote down the statements.

Q Did you hand write the statement?

A Yes, ma'am.

Q Was the defendant given an opportunity to

review that statement?

A Yes, ma'am.

Q And was the defendant given an opportunity to make any corrections to that statement?

A Yes, ma'am.

Q Were you satisfied that the defendant could understand English?

A Yes, ma'am.

Q Were you satisfied that the defendant could read English?

A Yes.

Q Did there come a time when the defendant signed the statement?

A Yes, ma'am.

Q Where did he sign that statement?

A I believe he signed it, if I can refresh my memory on the original statement please.

MS. HENRY: Can I have this marked as People's three for I.D.

THE CLERK: People's three for I.D, two pages collectively. So marked.

(People's Exhibit 3 was marked for Identification)

Q Does that refresh your recollection?

A Yes, ma'am.

Q And my question was where did the defendant sign the statement?

A Bottom of page one, at the end of the statement on page two and also at the bottom of page two.

Q While you have this in your hands, what has been marked as People's two for I.D, do you recognize it?

A Yes.

Q What do you recognize it to be?

A The statement of admission secured from the defendant, Wesley Martin.

Q How do you recognize it as such?

A My handwriting, and it's a copy of the statement that I secured.

Q And is it in the same or substantially the same condition as the last time you saw it?

A Yes.

MS. HENRY: The People move what has been previously marked as People's three for Identification into evidence.

MR. CARMAN: No objection.

THE COURT: Thank you.

THE CLERK: People's three in evidence, so marked.

(People's Exhibit 3 was marked into Evidence)

Q When the defendant made the statement how were you situated?

A I was seated at a desk. He was sitting in a chair, next to the desk, handcuffed to the chair.

Q And the detective who you mentioned before, his name?

A Detective Sventoraitis.

Q Was he in the room with you when the defendant made the statement?

A The statement, I don't recall if he was there for the statement. I know he was there for the rights. I don't recall if he was there for the statement.

Q You stated that the defendant was handcuffed?

A Yes, ma'am.

Q How was he handcuffed?

A His hands.

Q Which hands?

A Right hand. In that room it's to the arm of the chair that is there or to the desk. There is an opening in the desk that we have to handcuff the defendant's hands.

Q Who, besides yourself, questioned the defendant?

A During the statement?

Q Yes.

A Myself.

MR. CARMAN: I'm sorry.

What was the answer?

A Myself.

Q And where was your weapon during that questioning?

A In my locker.

Q How long after you read the defendant his Miranda warnings did he make that statement?

A I know it was a busy night. We were in the computer room. This was the only room available. Guys were in and out. I remember going out half hour, 45 minutes. Other detectives needed to use the room. We had to excuse ourselves and then when we finished using the laptop we went back in. That was the only room available.

THE COURT: Was that a response to your question?

MS. HENRY: Not precisely.

A Approximately 30 to 45 minutes after Miranda.

Q Thank you. You stated that you had to vacate the room for other detectives?

A Yes.

Q Where was the defendant when you vacated the room?

A I removed him from the chair, put him into the, I guess, a holding pen up on the second floor, and then handcuffed him. And then when the room is vacated, they were finished with the computer, we went back into the room.

Q Did you question the defendant at all when he was in the holding pen?

A No, it was crazy. I just waited until we got back into the room.

Q Where were you when the defendant was in the holding pen?

A Waiting for the detectives to finish in the room by my desk or just waiting around.

Q Now, detective, where, if anywhere, did you take the defendant after he made the statement?

A After the statement he would be back in the holding pen and downstairs to get fingerprinted and photographed. Then back upstairs to the holding pen until he was transported to headquarters.

Q Thank you detective.

MS. HENRY: The People have no further questions for this witness.

CROSS-EXAMINATION:

Q Good afternoon, sir.

MR. CARMAN: May I proceed?

THE COURT: Yes, of course.

A Good afternoon.

Q Detective, I noticed during direct examination there were occasions when you couldn't recall a time or remember a date on a fact in this case, and you used certain documents to refresh your recollection, do you recall that?

A Yes, sir.

Q ADA Henry asked you when the written statement was finally taken from Mr. Martin and she asked you basically for a time--

A Yes.

Q As I recall your testimony you said it was approximately 30 minutes or so, 35 minutes after Miranda, yes?

A Correct.

Q And Miranda was given, according to the card, at approximately five o'clock?

A Seventeen hundred hours.

Q Five o'clock p.m., civilian?

A Yes.

Q Do you have a document that you prepare during the processing of Mr. Martin that you could refer to that would tell you, not approximately, when the statement was taken?

A Crime report 85A.

Q Do you have a copy with you?

A I believe I do.

Q Do you want to take a look at it?

A Can I?

THE COURT: Yes.

MR. CARMAN: Can it be marked defendant's A for I.D.

THE CLERK: Defense Exhibit A for I.D.

(Defendant's Exhibit A was marked for Identification)

MR. CARMAN: May I see a portion of it please? I ask it be shown to the witness.

Thank you.

THE COURT: Being shown to the witness.

Q Before you refresh your recollection with the document I would like to ask you a few questions about it actually. Have you had enough of an opportunity to look at that?

A Yes.

Q Does it refresh your recollection as to when you concluded taking Mr. Martin's written statement on January 16th?

A Yes, sir.

Q And the document that you were looking at that was the document prepared by you?

A Yes.

Q When was it prepared?

A That day, during the arrest processing, after speaking with Mr. Martin, go on the computer and time out the arrest.

Q The document that you are using to refresh your recollection as to when the statement was rendered what was the time and date that document was prepared, the 85A? If you don't remember feel free to look at it.

A It says printed on 1-16-06, at 2216 hours, which equates to 10:16 p.m, by me, Detective Decaro.

Q 10:16?

A Yes.

Q At 10:16 you insert the data what time the statement was taken?

A No, that is the time it is printed out. After the arrest is done on the computer, for our boss to review the paperwork and after he does that

we print out and that is the time stamp on top of the paperwork.

Q When is the information put into the computer?

A As soon as we start processing.

Q When is the information regarding the time of the statement put into the computer?

A When I enter it into the popup box which says defendant's statement.

Q I understand that but what time is it; not when the pop up box pops up?

A The actual time the pop up box pops up on the screen?

Q Sure.

A No.

Q You don't know when it was inputed?

A After I spoke to Mr. Martin, between the time I spoke to him and got the statement and the time I print it out. It had to be prior to this because the boss had to review all the documents.

Q I understand that.

A Okay.

Q Miss Henry introduced People's Exhibit two. It might be three, Wesley Martin's statement. Do you have it there?

MR. CARMAN: Can that be shown to the witness. Was it three or two?

THE CLERK: Three.

Q Sir, can you show me where on that statement it's indicated by either you or Mr. Martin the time when the statement was started, interrupted, finished, anytime whatsoever?

A I just have the date, January 16th.

Q There is no time that--

A No, sir. That is standard operating procedure. No line for time on here. We just put the date and mark that on the 85A and sit down at your computer.

Q You indicated that during the questioning process of Mr. Martin that you took him into an interrogation room or interview room?

A Yes, sir.

Q And Mr. Martin, when he was brought to that room he was in handcuffs?

A I don't recall if he was in handcuffs but eventually when he is seated we have to handcuff him to the desk or chair.

Q When you took him into custody, out of Williston Park, he was in handcuffs?

A Yes.

Q Transported in handcuffs?

A Yes, sir.

Q And walked into the precinct with handcuffs?

A Yes.

Q And you handcuff him to the table?

A In the holding pen it is to the handcuffs along the perimeter on the wall.

Q From the time you first apprehended him?

A Yes.

Q And things were so busy at the squad you had to put him in a holding pen for a while?

A Yes.

Q And then you took him out into the interview room?

A Yes.

Q And you began to talk to him about this Mercedes Benz that was stolen?

A Correct.

Q Would it be fair to say that you alluded to some comments that were exchanged immediately before you placed him under arrest? He didn't tell you, at that time, that he had taken the car, did he?

A Yes.

Q Before you took him into custody?
A Prior to 1620 on the 16th.
Q On January 16th when you saw him, when he found out he came out and said I took the Mercedes?
A We were talking to him and he wanted to show me, he said he was friends with Alex and he said he would show me where he parked the car that he took that night.
Q So, your testimony here today, for the first time, is that the first time he told you that he had taken the car was just before you put him in custody?
A Yes, that's the reason I placed him in handcuffs and brought him to the squad.
THE COURT: Okay, so before you actually arrest him you are all out on Willis Avenue?
THE WITNESS: Yes.
THE COURT: He comes in-- I'm sorry for interrupting. I want to make sure I get it right. He finds you and Detective Sventoraitis and he walks up and you are just talking to him?
THE WITNESS: Yes.
THE COURT: What kind of talking; "Hey, how are you?"

THE WITNESS: We identified ourselves. We said we spoke to Alex at Euro Car. He knew the police were involved because, I believe, he was there that day that the police were there, along with the complainant, Mr. Jenks and the owner Alex. So, it was like he was waiting to talk to me about the incident. Because on the first occasion I had to speak to Mr. Martin on the 16th.

THE COURT: Just so we are all clear that entire conversation is not noticed pursuant to 710.30?

MS. HENRY: It is not.

MR. CARMAN: That's right. It is not.

Q How long have you been a detective?

A Two years.

Q And how long have you been a police officer?

A August, 10 years.

Q Can you tell me if there is one place in any records or reports that you ever wrote in this case where you show that you had a conversation with Mr. Martin during which he admitted that he took the car?

A If I can review the crime report?

Q You can review anything that you brought or anything that you can think of.

A Okay, counsel, may I see it please?

Q Did you ever make any notation, anywhere, regarding the exchange you just described that is where Mr. Martin admitted, at that time and at that place on Willis Avenue, at approximately 4:20, that he had taken the Mercedes Benz?

A No, it is not noted.

Q Sir, isn't it true that prior to reporting to the location you believe Mr. Martin lived that you had a discussion with Mr. Esquivel about his recent conversations with Mr. Martin?

A Recent conversations as--

Q During direct, which you told us on that day, the 16th, you went down to Euro Car to speak to Mr. Esquivel?

A Yes, sir.

Q And you had a conversation with him that morning?

A That afternoon.

Q Did you have other conversations with Mr. Esquivel either on the phone or in person, at that time or before?

A Yes.

Q Would it be fair to say that Mr. Esquivel told you that he had been in communication with Mr. Martin about the car?

A About the car, no, no. I don't believe the car. I know he was in communication because Mr. Jenks was giving Mr. Esquivel a hard time. He wanted to know the whereabouts of his car and Mr. Jenks was putting pressure on Mr. Esquivel.

Q Did Mr. Esquivel tell you he was speaking with Mr. Wesley Martin about the car disappearing?

A I recall Mr. Martin was there that day when the police were there to take the initial report.

Q On January 9th you learned that Wesley Martin had gone down to Euro Car, the day of the report, and there had been a discussion involving Mr. Martin that included Mr. Esquivel related to the car?

A I don't know. I know Mr. Martin was there. I know tempers flared between Mr. Jenks and Mr. Esquivel and Mr. Martin. Uniform officers responded. Mr. Martin left. I don't know the details of that conversation.

Q Did you ever ask Mr. Esquivel, when the tempers flared that day with Wesley Martin, did he

ever say I took the car keys for the Mercedes Benz?

A That I don't recall.

Q Did he ever say, Wesley Martin ever say, I took the car. I am really anxious for the cops to process me so I can move this along. Did he ever admit--

A No.

Q So, Mr. Esquivel never said to you, detective, when Wesley Martin came in he actually admitted to taking the car; that never happened?

A No.

Q On the morning of the 16th when you went over to see Mr. Esquivel did you have any other conversation with him about any interactions he had with Mr. Martin?

A I don't believe Mr. Martin went-- From what I recall I don't believe Mr. Martin went back to Alex's shop since the date the police were there on the 9th. I don't recall him mentioning anything prior to that.

Q Do you know if Mr. Esquivel was going to Mr. Martin's house?

A That I don't know.

Q Sir, you were assigned, according to your direct testimony, on or about January 9th, 2006, as

the detective responsible for investigating the theft of the vehicle in this case?

A Correct.

Q And isn't it fair to say that the vehicle was recovered three days later on January 12th?

A I believe that is correct. I know it was recovered previous to Mr. Martin being arrested.

Q Would it also be fair to say that later on the 13th that a fingerprint request was lodged for the vehicle?

A Yes.

Q And that request for fingerprints was made by you, was it not?

A Personally, no. I know it was my case and when the car was located by uniform officers it was placed in my name for headquarters impound for prints and photos.

Q And another detective would have been responsible for obtaining any fingerprints from the vehicle?

A That would be the crime scene detectives when it goes over to the Bellmore facility. That is where they process any vehicles.

Q And that is not something that you personally take responsibility for doing physically?

A I didn't see the vehicle until I released it to Mr. Jenks at a later time.

Q Nevertheless, you are aware the print request was made?

A It was covered when I returned to work and there was the form in my case jacket.

Q Can you tell me at what point, prior to the time that you arrested Wesley Martin, that you checked to see what the results of the fingerprint request were?

A If I recall, if I can review the print request?

Q If you don't remember--

A I don't remember.

Q Sure check your records.

A Please. I have the actual prints from the car. I was told by crime scene that there was negative results for the prints. There were no identifiable prints obtained from the crime scene. I have the actual window tag from the car when I removed that from the impound yard.

Q Detective, it's your recollection today that you received a phone call that the results were negative?

A There was a note or an e-mail that the car

was ready to be released from the crime scene.

Q And that note or e-mail would have been sent to you as the assigned detective?

A It was a phone call. I know I spoke to crime scene. I don't remember if it was a note or phone call. When I came in there was a note for the day I worked saying the car was ready to be picked up because they had no room to store it at the facility.

Q As you sit here today can you tell the Court what date that note or e-mail came?

A Can I check my case report on the impound record?

Q So, my question is prior to the time that you arrested Wesley Martin did you learn that the request for fingerprints had been processed and completed?

A Yes, sir.

Q What is your refreshed recollection as to what you learned about that?

A That the vehicle was processed and ready to be released as per the crime scene detective, and it was not being picked up. It was to be brought to Cedar Creek for pick up and there were negative results on the print.

Q And the document from your case file that you refuse to refresh your recollection was the motorvehicle impound record?

A It's the one I just gave the court officer.

THE CLERK: This is now marked Defendant's B for I.D.

(Defendant's Exhibit B was marked for Identification)

Q Sir, by looking at that document you refreshed your recollection and remembered that the print came back as unprocessible or no recoverable print?

A Yes.

MR. CARMAN: Your Honor, for purposes of the hearing I will just ask that it be moved into evidence so I can ask the witness some questions about it.

MS. HENRY: The People have no objection.

THE COURT: Defendant's B for identification is now in evidence.

THE CLERK: Defendant's exhibit B is marked into evidence.

(Defendant's Exhibit B was marked into Evidence)

MR. CARMAN: Can it be shown to the witness please.

Q Detective, would you, once you have Defendant's B in your hands, indicate for me where you see any indication regarding the fact that the fingerprint analysis came back as inconclusive or unprocessable. I'm not sure what words.

A A request for prints and photos and the car was ready to be released. There was nothing to be found. I recall that it was ready to be released to the owner. They notified us on the 13th of January. It looks like 9:33 in the morning they called the Third Squad.

Q But this document does not tell you what happened with the fingerprint analysis. It just tells you the print processing has been done and the car is available for release, yes?

A Yes.

Q It does not say it is inconclusive positive or negative?

A No.

Q So, by the time you arrested Wesley Martin would it be fair to say that you didn't know whether his fingerprints were connected to the vehicle that Mr. Jenks had reported stolen?

A That is it, yes.

Q Just briefly about the interrogation. Do you have any recollection of the interrogation of Mr. Martin asking to speak to a parent before he spoke to you?

A I believe he spoke to his father afterward. He asked if he could call his father.

Q After he gave the statement; that is when?

A Later in the afternoon.

Q You don't remember him asking to speak to his father during the interrogation?

A No, sir.

Q Would you have let him do that had he asked?

A Sure.

Q Do you remember Mr. Martin being concerned about his medication?

A I don't recall.

Q Do you remember talking to him about the fact that he's got a medical disorder?

A No.

Q Never came up?

A No, I have no recollection of medical disorders.

Q Do you recall, during the interrogation

process whether Mr. Martin was agitated and upset?

A He appeared to be upset.

Q When you say appeared to be upset he was crying?

A I don't remember crying. I remember him being upset.

Q You don't remember if he was crying?

A I don't recall.

Q During the interrogation process was there a time when there was some resistance from Mr. Martin about giving a statement?

A At the Third Squad?

Q Yes.

A No.

Q Did you tell Mr. Martin, at any time, if he admitted to taking the car that you could talk to your boss, who was in a good mood, and he would be able to go home that night?

A No.

Q You never told him that?

A No. This charge is not eligible for release on--It's not eligible for release on an appearance ticket.

Q But did you tell him that physically, admitted that he might be able to go home that

night?

A No.

Q Did you tell his father, did you ever speak to his father?

A I believe I did speak to Mr. Martin.

Q Did you tell his father it is not a big deal?

A I remember speaking to the family, telling him where he was going to be that day and what he was charged with because he was concerned.

Q Detective, the last thing I would like to ask you about very quickly with the videotape.

MR. CARMAN: Can we go back to the first segment briefly?

(Video being viewed)

Q Detective, on 12-16-2005, at 1729, is it your testimony that the person in the middle of that scene was identified by Mr. Esquivel as Wesley Martin, the defendant in this case?

A Yes, sir.

Q And it would appear Mr. Martin is wearing a whitish color jacket?

A Yes.

Q And some type of cap. And it appears at least that the man is wearing blue jeans or dark

colored pants?

A I believe so. I can't see.

MR. CARMAN: Back it up, the tape.

Q Detective, it would appear that the person that was identified as Mr. Martin, in this video, is wearing blue jeans or dark colored pants?

A Yes, sir.

Q I don't recall what your answer was the person seated at the desk, behind him, did Mr. Esquivel ever identify who that person was?

A I don't recall.

Q And you watched that segment of the video tape with Mr. Esquivel?

A At that computer that person is on with the blue shirt. That is Mr. Escoval's personal computer right there in that corner.

Q But the video tape is not clear enough to see his face?

A Correct.

MR. CARMAN: Would you be kind enough to go to the fourth clip?

THE COURT: Who is the guy in the red jacket?

THE WITNESS: I don't know.

Q Now, we are looking at a clip that depicts

12-17-05, 1:47 or so, which is approximately--Would that be eight hours, nine hours after the video that we just watched. Just take it back to the person walking across. Detective, would you agree with me that at least insofar as you could tell from this video that the person we are looking at eight or nine hours later is wearing a jacket that would appear to be darker in color from what the complainant is wearing?

A Standing in a dark section like that. You could go a few seconds forward.

Q Would you agree with that?

A Yes.

Q Did you discuss Mr. Martin's manner of dress with Mr. Esquivel?

A Yes.

Q Did he talk about a jacket that he always wore?

A Yes.

Q He says he wears a tan jacket?

A Yes.

Q Beyond that, during your direct testimony under questioning by the Court, you were asked what was it being--Excuse me. Withdrawn.

You were asked what it was that Mr. Esquivel said th

identified Mr. Martin in this video tape as the person th he was seeing. Do you recall that?

A Yes.

Q And you indicated that it was his mannerism?

A Yes.

Q He didn't tell you that he could see his face from the video tape, did he?

A No, you can't see his face.

Q And it was simply the mannerisms he used as a basis for the I.D.?

A Yes.

Q All right.

MR. CARMAN: I have nothing further.

THE COURT: Miss Henry?

MS. HENRY: Brief redirect?

THE COURT: There is no time pressure. If that is what you have to do.

REDIRECT EXAMINATION:

Q Detective, on cross you referenced January 9th of '06. On that date you said that there were police officers at Euro Car on that day?

A Yes, the date the report was taken uniform officers responded.

Q Were you present at Euro Car Inc on

January 9th?

A No.

Q And finally your conversation with Mr. Esquivel, on January 16th--Withdrawn.

Detective, can you tell us what factors lead you to believe that the defendant took the Mercedes Benz?

A Mr. Esquivel, he was adamant that he believed Mr. Martin is the one responsible for taking the car, and he had known him for a number of years. It was not like a person he just met. He knew him for three years prior to this date of the incident.

Q After this conversation with Mr. Escoval--when did that take place?

A On the 16th, in his office.

Q While you were watching the video?

A Yes.

Q It was your testimony that when watching the video Mr. Esquivel identified Mr. Martin in the video?

A Yes.

MS. HENRY: Your Honor, I have no further questions.

MR. CARMAN: No recross.

THE COURT: Detective, there came a point

in time you referred to the keys to the car?

THE WITNESS: No. I don't know if you read the statement.

THE COURT: It says that he threw the keys. That is why I am asking.

THE WITNESS: The keys were not recovered. The vehicle was recovered on a side street.

THE COURT: How did the vehicle get back to Euro Car?

THE WITNESS: I don't know if it went afterwards with Nassau County uniform officers, Third Precinct officers.

THE COURT: I'm sorry the car was impounded.

THE WITNESS: And it went to Cedarcreek. I met with Mr. Jenks to release the car to him. He followed me down there, unlocked the gate, gave him a boost and he drove the car out, and I don't know whether it went back to Alex at Euro Car. I don't think he was too happy with Mr. Alex. I don't think the car went back there.

THE COURT: You don't think Mr. Jenks was happy with Alex?

MR. CARMAN: I think the Court should take

judicial notice that Mr. Jenks is rather happy with anything.

THE COURT: I have no comment in response.

Okay, how many conversations with Mr. Esquivel did you have with respect to that it was the defendant that took the keys to the car?

THE WITNESS: I spoke to him on the phone a few times. Our schedules were off. He was out trying to locate parts or he was not in the office. So, I guess we were just playing phone tag until it happened to be on the 16th that we got together for a couple of phone calls.

THE COURT: Were you convinced that the person that was--never mind.

The basis for your arrest was you relied upon Mr. Esquivel?

THE WITNESS: No.

THE COURT: No. Did you think that the person that was walking in the segment at 1:47 in the morning, did you think that was the same person that was walking in the shop at 5:30 or 5:27?

THE WITNESS: Myself?

THE COURT: Yes.

THE WITNESS: It's possible, but I can't make an I.D. off that.

THE COURT: Did the walk in the car shop look like the same person?

THE WITNESS: Yes. After seeing Mr. Martin approaching me down Willis Avenue, to me this was the same type of walk. It was a little gated the walk, the mannerism.

THE COURT: You said in your questioning by Miss Henry you mention something about the walk. What was it about the walk?

THE WITNESS: Just the arm movement, the swaggering. It was very similar after seeing the video at Euro Car and Mr. Martin walking towards us on Willis Avenue. While we are talking to the man sweeping or shoveling it looked very similar to the person that was on the screen.

THE COURT: Okay, I'm sorry.

Any questions?

MS. HENRY: None, your Honor.

THE COURT: Mr. Carman?

MR. CARMAN: None, your Honor.

THE COURT: Would anybody like to make a closing argument?

MS. HENRY: Yes, your Honor.

MR. CARMAN: Before Miss Henry closes I don't know if you rested.

THE COURT: I'm sorry. She told me previously she only had one witness.

MR. CARMAN: The next order of business I need to speak to my client to decide whether or not he will testify outside. So, can I have that?

THE COURT: Take as much time as you need.

MS. HENRY: The People rest.

THE COURT: The People have rested and Mr. Carman?

MR. CARMAN: Your Honor, Mr. Martin will testify. I call him.

THE COURT: Defense calls Mr. Martin.

W E S L E Y   M A R T I N, a witness called on behalf of the defense, after having been first duly sworn and having stated his residence as 717 Willis Avenue, Apartment 7A, Williston Park, took the witness stand and testified as follows:

DIRECT EXAMINATION:

Q Good afternoon Mr. Martin.

A Good afternoon.

Q I would like to direct your attention first to let me ask you do you know Alex Esquivel?

A Yes, sir, approximately three years.

Q And you heard the testimony here today?

A Yes, sir.

Q And there was testimony about a missing Mercedes Benz?

A Yes, sir.

Q When did you first learn that Mr. Esquivel was missing a Mercedes Benz at Euro Car Inc.?

A A week or two before.

Q Before?

A Before the cops came to my apartment.

Q So, January of '06?

A Yes.

Q And a couple of weeks before that is the first time you learned about it?

A Yes, sir.

Q How?

A He came to my apartment with workers.

Q Who?

A Alex and one of his workers.

Q Did you get to talk to him?

A It was early in the morning. I didn't answer the door.

Q What happened after that?
A He came again, same thing, with another worker.
Q What time did they come?
A In the morning, late morning.
Q Did you speak to him?
A I said why do you keep coming to my apartment, banging on the door?
Q What did he say?
A He said I wanted to ask you a question.
Q What did you say?
A I went to his store and he said--
Q Did he ask you to come down to the store?
A Yes.
Q Did you go down there?
A Yes.
Q And tell us the conversation that took place?
A Well, I asked him why does he keep coming to my apartment. And I said I don't know what I did. There was a police officer there, a regular police officer.
Q Slow down. As you notice I speak very quickly, and the court reporter takes fits over it. Slow down a little bit.

A Sure. I just asked him why he keeps coming to my apartment, and he explained to me the car was stolen, and he waited in the office and after a while--

Q He had you wait in the office?

A He said go wait in my office.

Q Did he say why?

A He wanted to question me and I had Jenks too.

Q He was at the office?

A He was at the office.

Q And you went into the office where Mr. Jenks was?

A Yes, sir, and he was very upset.

Q Upset with you?

A Alex thought I took it so Ed Jenks thought I took it, and he was very upset towards me. He said if I found out you took that car I am going to have you arrested.

Q Slow down, slow down. Then what happened?

A Then I proceeded to get angry and I said I don't have to sit in this office. I have rights, and I walked out of the office and walked home right in front of the police officer.

Q Before you walked up and left the office

did you tell Jenks or Esquivel that you took the car?

A No, sir.

Q After you went home did you have contact after that with Alex Esquivel?

A Yes, sir.

Q When was that?

A The day that the detective came.

Q Approximately what time was that?

A Early afternoon.

Q What kind of contact?

A I called him. I said did you discover that I did not take the car.

Q Did you telephone him?

A Yes, sir.

Q At Euro Car?

A I don't want to be harassed by him and his workers anymore.

Q What did you say?

A I said have you discovered that I didn't take the car yet?

Q What did he say?

A He said there are detectives coming to your house today.

Q Did anyone else get discussed in that

conversation?

A No, it was very quick.

Q And --

A At this point he didn't want to talk to me and I didn't want to talk to him.

Q And the phone call was over?

A Yes, sir.

Q What was the next thing that happened?

A I was upstairs where I live with a friend of mine and the detective came looking for me. The construction workers saw them, I guess, they talked with him. I came downstairs. The construction worker says there are guys looking for you in suits. I said where are they. I proceeded to go outside. I looked to the right and then there they were a block away.

Q Was one of the detectives the detective that testified today?

A Yes, with another detective, yes, older man.

Q Venteritis?

A Yes.

Q You walked up to him the two of them?

A Yes.

Q Did you identify yourself?

A Yes.

Q What was the conversation?

A I said good afternoon. My name is Wesley Martin. I am being harassed by the man down the block. They said we have to ask you some questions and we walked in front of my apartment. And I said ask the questions at my apartment, and they said, no, at the station. Detective Decaro threw me against the car and handcuffed me and threw me in the back of the car and took me to the station.

Q Did you have a conversation where you admitted taking the Mercedes Benz?

A No.

Q Did you say in any way, shape or form anything?

A No.

Q Did he ask you whether you took it?

A No.

MR. CARMAN: Thank you.

THE COURT: Miss Henry.

CROSS-EXAMINATION:

Q Good afternoon Mr. Martin.

A Good afternoon.

Q You stated on your direct examination that Mr. Esquivel had come to your apartment?

A Yes.

Q Do you know what date that is?

A I don't know, two times he came.

Q How many times did he call?

A He doesn't call me ever. We don't have phone number exchange like that.

Q He didn't call to discuss the car?

A He came into my apartment, pulled up right in front of my apartment and banged on the door aggressively. And I told my mother and my father to go to the police station to file harassment charges.

Q Did you answer the door?

A No.

Q How did you know he was at the door?

A Because I looked outside the window early in the morning.

Q Is your apartment on the street level?

A Yes.

Q Mr. Martin, were you at your apartment on December 16th of '05?

A I believe I was.

Q Were you there on December 17th of '05?

A I don't think so. Is that the day the car was stolen?

MR. CARMAN: I think the witness is

entitled to know what you are driving at if it was the date the car was stolen.

A No, I was not.

Q Mr. Martin, it's your testimony that Mr. Esquivel never called you?

A That's correct.

Q Did you not state on direct that he called to tell you that the detectives were coming for you?

A I said I called him. There was no confusion in my story Miss. I called him and I asked him if he resolved what happened with his car and he said the detective is coming to your house today.

Q Mr. Martin, when the detective came to your apartment did you have any discussions regarding the Mercedes Benz?

A None. They said they wanted to ask me some questions. I knew what they were talking about. There was no discussion of me admitting to any car theft at all. And then I asked him to come into my apartment. When he said you are stubborn, threw me against the car, threw me and put me in handcuffs and took me to the station.

Q Did they tell you you were under arrest at that time?

A No.

Q When you were at the Third Precinct station house--

MR. CARMAN: I am going to object as outside the scope.

THE COURT: Sustained.

MS. HENRY: I have no further questions, your Honor.

MR. CARMAN: No redirect, your Honor.

THE COURT: Thank you, you may step down.

MR. CARMAN: The defendant rests, your Honor.

THE COURT: Okay, now, I will ask a question that I asked before.

Would anybody like to make a closing remark?

MR. CARMAN: I would, your Honor, since this is my hearing. It is my burden to close first.

Your Honor, it seems that in litigation we have these moments that are sometimes surprising, and I thought that listening to Detective Decaro, during direct examination, having had the opportunity to be prepared to testify here today when he was asked why did

you arrest Wesley Martin he gave a very, very clear answer. He said Alex was adamant. He knew him for three years. He believed that he took the keys and he took the car. You could read cases until you are a hundred and ten. That is never going to be probable cause. And I suggest to you, your Honor, that sometimes the facts are what they are and sometimes People are not willing to accept that. And I don't think Detective Decaro is as nice a fellow as he seems to be. I think he threw out that answer to my question about the comment that he alluded to that he never brought out before about this admission prior to arrest. Yes, Wesley came out, hunted me down in the street, basically threw his arms around me. I did it. Thank you for coming so I can let this off my heart. This is what it was. It is disingenuous. It borders on the perjury word. I don't want to say that but there is no scintilla of evidence in the record or file anywhere else that suggests that conversation ever took place. Makes one wonder because police officers they protect and they cherish defendant's statements like nothing else, and

if he made that statement, Judge, it would be everywhere and it wasn't.

So, your Honor, as strange as that testimony was from this detective I think it is counter balanced also by Wesley Martin, a very unsophisticated person, when it comes to the court system, which as you could tell, is never suspect about the prospect of testifying. He gave a clear account and which seems too meek as the type of fact that makes sense that coincides with common sense of what happened, what Wesley Martin told us. What Detective Decaro would have you believe, what our human experience is when these things happen. For those reasons I think Detective Decaro was almost perfectly believable. Up until that point he gave truthful testimony but it fell far short of the probable cause.

On that basis I ask that you suppress the written statement that attributed to Wesley Martin as fruit of the poisonous tree. It was gathered by law enforcement, without probable cause, after an arrest and beyond that I would suggest to the Court it was also involuntary. But for the rest of my motion there was no

probable cause and the statement should be suppressed.

Thank you.

THE COURT: Miss Henry.

MS. HENRY: As to the issue of probable cause, your Honor, in order to arrest the police must have probable cause. Probable cause exists when the officer has reasonable cause to believe that such person has committed such offense. I submit to you, your Honor, that the evidence elicited makes it clear that Detective Decaro, through his investigation of the case, had reasonable cause to believe that the defendant committed a crime. The detective testified that Mr. Esquivel, the owner of Euro Car Inc, identified the defendant on the security footage. He also stated that it was not that identification alone that lead him to have reasonable belief that the defendant committed the crime. Stated further evidence that after seeing the defendant in the street prior to arrest, after seeing him in the street he believed that it was the same person he saw on the video. He identified the characteristics of the defendant that he

believed were the same in this video, and that gave him reasonable cause to believe that it was the defendant who committed the crime. Thus giving him sufficient probable cause to make the arrest.

As to the statement the People have the burden of showing, beyond a reasonable doubt, that the statement was voluntary. The police are required to advise the defendant of his Miranda warnings only when he is both in custody and being interrogated. The defendant was in custody at the time of the statement. That's clear. He was probably Mirandarized at 1700, 5:00 p.m. He signed his Miranda card in multiple places. The People submit there was a proper Miranda and waiver of Miranda was knowingly and voluntary and intelligent. It does not violate Miranda. It was not the result of threats, coercion or promises of leniency. Based on this the People submit that we have met our burden and that the defendant's motion to suppress the statement and motion as to probable cause should be denied.

THE COURT: Miss Henry, I would like you to address yourself to the issue that has been

raised by Mr. Carman, which issue was discovered on direct exam and discussed by Mr. Carman in his remarks. That there's a serious factual discrepancy with respect to the conversation that goes on between the defendant and Detective Decaro on the day of arrest, out on Willis Avenue. And if you would like to take a few moments and direct yourself to that discussion I would be delighted to hear what you have to say about that.

MS. HENRY: Yes, your Honor. This comes down to what the People have to acknowledge and it comes down to credibility.

THE COURT: Yes, I agree. It comes down to credibility. But I am not asking you to direct yourself to that because I think I know what you want to say with respect to the credibility issue. But just put that aside for just a moment. I would like to know what your understanding is with respect to any notation, anything, anywhere that the detective may make that or anything that you discovered in your investigation of the case that relates to there being some preliminary discussion before the written statement gets taken. There is some

preliminary discussion where the defendant admits to taking the car to Detective Decaro. You didn't think to raise any of that discussion in your direct exam?

MS. HENRY: No, your Honor. It was my understanding these were not noticed statements. I did not elicit them on direct examination because of my concern of eliciting admissions from the defendant that were not heard of on a Huntley hearing. Beyond that such statement and this conversation would go to probable cause, as it did in the detective's testimony. I didn't elicit what were those conversations on that basis.

THE COURT: Okay. Mr. Carman and you don't have to agree or disagree. Would you agree that even without that conversation, even without that conversation according to Detective Decaro's version of that conversation, that the police would be permitted to take your client to the stationhouse and question him in the way that we have here, a written statement Mirandarized.

MR. CARMAN: Judge, my opinion on that, even on Law and Order, that is the only place.

You know what? In America you are not supposed to do it and the smart people say, "Am I under arrest." If they say no they have to have probable cause to stop you and take you. You are coming down to the station for questioning. Everyone believes that is how it works. You don't have to go down there. Wesley said come to my apartment and they said no you are coming down to the station, partner, okay. And people go down.

THE COURT: Your client at one point says to Jenks and Esquivel I have rights. He must have the where with all to say to Jenks, who is an attorney, and Esquivel, I have rights.

MR. CARMAN: The detective acknowledged he handcuffed him. I don't think that is in dispute, and brought him in. I don't think that is from 4:20 or so. That is not an issue really. He was not going down for voluntary questioning. He was under arrest.

THE COURT: Okay, all right. I will reserve decision, and you will hear from me. You can give it another date in this part before I send it back to Part five so we can have closure on the hearing.

MR. CARMAN: That is fine.

THE COURT: Well, Mr. Carman, I am so accustomed to Legal Aid. You may not even be here.

What day are you coming back in March, what date?

MR. CARMAN: I will be here-- If you would like a longer date to write the decision, 3-29 I will be here. Before that it looks like the 15th.

THE COURT: Okay, I will take the 29th. March 29th. Thank you everyone. Back here this part.

* * * * *

Certified to be a true and accurate record of the within proceedings.

Andrea Raso
Official Court Reporter

# EXHIBIT 2-M

DISTRICT COURT OF THE STATE NEW YORK

COUNTY OF NASSAU    PART: 10

- - - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK    : 2006NA001100

-against    :

WESLEY MARTIN,    :

Defendant.    :

- - - - - - - - - - - - - - - - - - - - - -X

P R O C E E D I N G S

99 Main Street
Hempstead, New York 11550
March 29, 2007,

B E F O R E:

HONORABLE: ERICA PRAGER, Judge.

A P P E A R A N C E S:

FOR THE PEOPLE
KATHLEEN RICE, ESQ.
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
BY: EDWARD BRADLEY, ESQ.

FOR THE DEFENDANT
666 Old Country Road
Garden City, New York
BY: JOHN CARMEN, ESQ.

Evelyn Klein
Official Court Reporter

COURT CLERK: Number 17, Wesley Martin.

THE COURT: This is a case where I presided over a hearing. It was a Huntley, Dunaway hearing with respect to a statement that was taken at the precinct. A statement of the defendant by the police.

I had an off the record conversation where I think I've given both sides my thoughts and how I arrived at my decision on this matter in a nut shell. I found that the defendant's testimony with respect to the conference that takes place out on the street between the defendant and the detective I find that testimony to be credible and I do credit that testimony with really possibly being the turning point here.

I was concerned about the new testimony that was elicited on cross examination by Mr Carmen of the detective where the detective indicated that out on the street the defendant comes essentially this is in substance of course the defendant comes walking up to the police and then indicates to the police right then and there at the scene on the street that he took a car and it's at that point that he's been handcuffed and brought back to the precinct to what is Mirandized.

The defendant's version is was that he doesn't say that out to the police on the street. As a matter of fact he wants to take up the issue about Mr Escoval

who is the complainant not the owner of the car.

Mr Janks but the owner of the other car but it is the defendant's contention that he want to take up Mr Escobar's alleged harassment with the defendant and he want to discuss that with the police is that a proper marshaling of that piece of testimony.

MR BRADLEY: I think it is.

MR CARMEN: Yes.

THE COURT: So based upon the totality of the circumstances I find that the police had probable cause with respect to the Dunaway portion of the hearing, the defendant had probable cause to arrest Mr Martin as they had Mr Martin's identification by Mr Escoval on the surveillance tapes and based upon that testimony, I did find that the detective was credible with respect to his conversation with Mr Escoval with Mr Martin and Mr Escoval's identification of Mr Martin on the surveillance tape so I do find with respect to the Dunaway portion of the hearing that the motion is denied and the arrest of Mr Martin was legal.

With respect to Mr Carman's point in his summarizing remarks about the statements out on the street and that goes to the Huntley portion of the hearing, I find that that statement is suppressed as fruit of a-well it's not fruit of an illegal arrest but

the written statement is suppressed and the People will not be able to offer it on their case in chief on their direct case at trial. For the reasons I already set forth which is factual discrepancy between conversation between I'm sorry, the factual discrepancy that goes on the conversation between the detective and the defendant.

So the case will go back to Part 5 for trial. Is there a date that's convenient for everybody.

MR CARMEN: April 17 can I have the 16th.

THE COURT: Is that good for your?

MR. BRADLEY: Is that for trial.

MR CARMEN: For control.

THE COURT: I don't know what Judge O'Brien's schedule is. So you might as well go back there and talk to him about the case.

COURT CLERK: 4/16 Part 5.

THE COURT: And I'll forward the file over. Thank you. Thank you for coming to the part.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF MINUTES TAKEN BY ME ____________________

# EXHIBIT 2-N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
WESLEY MARTIN,

Plaintiff, CV-08-4548 (ADS) (WDW)

v. **AFFIDAVIT**

COUNTY OF NASSAU, POLICE DETECTIVE CHARLES DECARO, in his professional and individual capacities, POLICE COMMISSIONER LAWRENCE W. MULVEY, in his professional capacity, POLICE FIRST DEPUTY COMMISSIONER ROBERT MCGUIGAN, in his professional capacity, POLICE ASSISTANT COMMISSIONER DAVID S. MACK, in his professional capacity, POLICE ASSISTANT COMMISIONER DENIS MONETTE, in her professional capacity, POLICE CHIEF OF DEPARTMENT ANTHONY ROCCO, in his professional capacity, POLICE CHIEF OF DETECTIVES PATRICK O'CONNER and NASSAU COUNTY PROSECUTOR,

Defendants.
-----------------------------------------------------------X

**STATE OF NEW YORK)**
**ss.:**
**COUNTY OF NASSAU )**

**CATHERINE HENRY**, being duly sworn, deposes and says:

1. I am an Assistant District Attorney in the Office of the Hon. Kathleen M. Rice, District Attorney for the County of Nassau. I was assigned to prosecute the case of *People of the State of New York v. Wesley Martin*, Nassau County District Court Criminal Term, Docket No. 2006NA001100. I make this affidavit based upon my personal knowledge, and based upon review of the books and records maintained in the Office of the Nassau County District Attorney relevant to the prosecution of Wesley Martin ("Martin").

2. On January 16, 2006 Martin was arrested and charged in the Nassau County District Court with violating New York State Penal Law ("PL") § 155.35, Grand Larceny in the Third Degree, a Class D Felony, in connection with theft of a motor vehicle. Section 155.35 provides that "A person is guilty of larceny in the third degree when he steals property and when the value of the property exceeds three thousand dollars."

3. On May 25, 2006, pursuant to CPL § 180.50, "Proceedings upon felony complaint; reduction of charge," the First District Court ordered reduction of the felony offense charged against Martin under PL § 155.35, to a non-felony or misdemeanor offense of Petit Larceny under PL § 155.25.

4. On June 21, 2007, on behalf of the People of the State of New York, I made an oral motion before the First District Court to dismiss the misdemeanor charge against Martin pursuant to CPL § 170.30(1), "Motion to dismiss information, simplified information, prosecutor's information or misdemeanor complaint" and, specifically, under § 170.30(1)(f). The relevant portions state:

> 1. After arraignment upon an information, a simplified information, a prosecutor's information or a misdemeanor complaint, the local criminal court may, upon motion of the defendant, dismiss such instrument or any count thereof upon the ground that: * * *
>
> (f) There exists some other jurisdictional or legal impediment to conviction of the defendant for the offense charged.

5. The Court granted the People's motion, and the misdemeanor charge against Martin was dismissed. A copy of the Certificate of Disposition issued by the District Court is annexed hereto.

6. Such dismissal under CPL §170.30(1)(f), due to jurisdictional or legal impediment, is not a dismissal in favor of the accused.

CATHERINE HENRY

Sworn to before me this

7th day of May, 2009

NOTARY PUBLIC

GEORGE J. SMIT
NOTARY PUBLIC, State of New York
No. 01SM5019700
Qualified in Suffolk County
Commission Expires Nov. 1, 2009

**CERTIFICATE OF DISPOSTION**
DISTRICT COURT OF NASSAU COUNTY - HEMPSTEAD

================================================================

THE PEOPLE OF THE STATE OF NEW YORK
VS.
MARTIN, WESLEY A
717 WILLIS AVE
WILLISTON PARK NY 11596

DOCKET NUMBER: 2006NA001100
DATE OF BIRTH: 07/31/1971
NYSID#: 08615730Y
DATE OF ARREST/ISSUE: 01/16/2006

**ARRAIGNMENT CHARGES:**

| | |
|---|---|
| PL 155.35 00 DF | GRAND LARCENY |
| PL 155.25 00 AM | PETIT LARCENY |

DATE OF DISPOSITION: 06/21/2007 JUDGE: O'BRIEN, W PART: C5

**DISPOSITIONS:**

| | |
|---|---|
| PL 155.35 00 DF | DISMISSED |
| PL 155.25 00 AM | PETIT LARCENY<br>DISMISSED AND SEALED UNDER CPL SECTION 160.50 |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

MICHAEL BEGANSKAS
CLERK OF THE COURT

05/04/2009
DATE

FEE: NONE
NUMBER: 19568

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL.)

SUPREME COURT OF THE STATE OF NEW YORK
FIRST DISTRICT: CRIMINAL TERM: PART 5
-----------------------------------x

PEOPLE OF THE STATE OF NEW YORK, INDICTMENT NO. 2006NA001100

- against -

WESLEY MARTIN,

Defendant.

-----------------------------------x

99 Main Street
Hempstead, NY 11550
June 21, 2007

B E F O R E:

HONORABLE WILLIAM O'BRIEN,
Justice of the Supreme Court

A P P E A R A N C E S:

KATHLEEN RICE, ESQ.
Nassau County District Attorney
BY: CATHERINE HENRY, ESQ.
Assistant District Attorney

JOHN CARMAN, ESQ.
Attorney for Defendant WESLEY MARTIN
666 Old Country Road
Garden City, New York

RENEE BELMAR
OFFICIAL COURT REPORTER

Proceedings

THE COURT CLERK: Number 47, Wesley Martin.

MR. CARMAN: John Carman, 666 Old Country Road, Garden City, New York.

THE COURT: I understand the People have an application.

MS. HENRY: Yes, the Defendant is charged under Docket Number 2006NA001100. At this time the People move to dismiss the count of penal law section 155.25 pursuant to CPL 170.31.

THE COURT: It's your intention to dismiss the docket?

MS. HENRY: Yes.

THE COURT: I assume you join in that application?

MR. CARMAN: Yes, I do, Your Honor.

THE COURT: The application is granted; charges are dismissed.

* * * * *

Certified to be a true and accurate record of the within proceedings.

______________________________

Renee Belmar
Official Court Reporter

# EXHIBIT 2-O

POLICE DEPARTMENT
COUNTY OF NASSAU, NEW YORK

INTERNAL CORRESPONDENCE

**DATE:** October 9, 2007 **SNCC NO:** 3030

**TO:** Deputy Commanding Officer Third Squad

**FROM:** Detective Charles De Caro, Third Squad, Shield No. 1047,Serial No. 8082

**SUBJECT:** **NOTICE OF CLAIM INVESTIGATION, WESLEY MARTIN V. COUNTY OF NASSAU**

1. I am making this statement for administrative purposes only. I have not done so voluntarily, but in compliance with an order of a superior officer. This statement in no way constitutes any waiver of my rights and this statement, or any part thereof, may not be used against me in any subsequent criminal proceeding.

2. On January 9, 2006, I was assigned to investigate Case Report 206CR0002557. During my investigation I interviewed the complainant's to this case Alex Esquivel, owner of Euro Car Inc and Edward Jenks, owner of a vehicle that was stolen from Mr. Esquivel's business.. Mr. Esquivel's business is located at 657 Willis Ave in Mineola, New York. During my interview of Mr. Esquivel he provided myself with a copy of video footage from his business, both interior and exterior shots. Mr. Esquivel was able to locate when his customer, Edward Jenks'1985 Mercedes Benz 380 S was stolen from his place of business. While watching the video with the complainant he identified a male white subject, Wesley Martin as the person who stole his customers vehicle. Mr. Esquivel, while watching the video observed Mr. Martin reach behind the front desk, located in the lobby area and removed a set of keys. Later that same night, the same male appeared on video. Mr. Esquivel stated that this male was Wesley Martin. The male then walked over to Mr. Jenks vehicle, unlocked the door, started it up then drove away. Mr. Esquivel stated that the male he observed on the video was Wesley Martin, because Mr. Martin frequents his business on a daily basis. I watched the video with Mr. Esquivel as he pointed out (identified) Mr. Martin. I contacted Electronics Squad, who responded and secured the video footage.

3. On January 16, 2006, I located Wesley Martin on Willis Ave and Syracuse St in Williston Park with Det. Sventoraitis. While talking to Mr. Martin he admitted to taking the car for a joy ride, but he got scared when he observed a marked RMP. Mr. Martin said he drove the vehicle through the back streets and parked it somewhere. The male was placed under arrest and transported to the 3rd Squad for arrest processing. While at the 3rd Squad, the defendant gave a statement of admission, which was reduced to writing detailing the larceny of the automobile and how he stole the vehicle's keys from the repair shop's office.

Charles DeCaro

Detective

**DOCUMENT:** N:\DeCaro\Mater of Clain Wesley Martin.doc

# EXHIBIT 2-P

NASSAU CO. ATTORNEY 2007 AUG 24 PM 2 14

COPY RECEIVED THIS 24 DAY OF August 2007 COUNTY ATTORNEY NASSAU COUNTY BY

**NOTICE OF CLAIM**

-----------------------------------------X

In the Matter of the Claim of

WESLEY MARTIN

- against -

COUNTY OF NASSAU, THE NASSAU COUNTY POLICE DEPARTMENT, DETECTIVE CHARLES DE CARO

-----------------------------------------X

TO: COUNTY OF NASSAU
Office of the Nassau County Attorney
One West Street
Mineola, NY 11501

PLEASE TAKE NOTICE that the undersigned claimants hereby make claim and demand against you as follows:

1. **Name and post office address of each claimant and claimant's attorneys is:**

| **Claimant** | **Attorney** |
|---|---|
| WESLEY MARTIN<br>8 Edwards Street Apt 2C<br>Roslyn Heights NY 11577 | |

2. **Nature of Claim:** The nature of the claim is for false arrest, false imprisonment, intentional and negligent infliction of emotional harm, negligence, negligent hiring and retention, negligent supervision and training, abuse of process, malicious prosecution and violation of civil rights all of which resulted in and caused severe and permanent personal injury to claimant WESLEY MARTIN, and all other damages allowed by statute and case law as a result of actions perpetrated by members of the NASSAU COUNTY POLICE DEPARTMENT and the COUNTY OF NASSAU, DETECTIVE CHARLES DE CARO their agents, servants, licensees, employees and other affiliate agencies and departments, without any contributory negligence on the part of the claimants.

3. **The time when, the place where and the manner in which the claim arose:** The incident complained of started on January 16, 2006 at approximately 1:00 PM at Claimant's home at 717 Willis Avenue, Williston Park, NY 11596 and continued through the 3th Precinct, Nassau County, when claimant was finally released about 10:00 p.m. the next evening. At the above dates, times and locations, Claimant, WESLEY MARTIN, was unlawfully arrested,

prosecuted, and handcuffed with excessive force and pressure, all without just or probable cause by members of the Nassau County Police Department. Claimant was detained against his will without probable cause for about 33 hours during which time he was handcuffed, fingerprinted, photographed, intimidated and threatened. Claimant was thereafter prosecuted maliciously and without probable cause to believe a crime was committed. The complaining witness, proffered charges against claimant falsely and maliciously. All charges against claimant were dismissed on June 21, 2007.

This incident resulted in severe personal and permanent injuries and damages to said claimants as set forth herein below as a result of the negligent, gross negligent, intentional, careless, and reckless conduct of the COUNTY OF NASSAU, THE NASSAU COUNTY POLICE DEPARTMENT, and DETECTIVE CHARLES DE CARO its agents, servants, licensees employees and other affiliates agencies and departments, and those acting under its direction, behest, permission and control as set forth above and in the general operation, supervision, governance, and maintenance of the NASSAU COUNTY POLICE DEPARTMENT, including, but not limited to the following acts and omissions: failure to properly supervise, failure to properly screen and hire, failure to discipline, train and retrain, failure to maintain an effective system of discipline and retraining for police officers, false arrest, intentional and negligent infliction of emotional harm, negligent hiring and retention, negligent supervision and training, abuse of process, malicious prosecution and violation of civil rights.

4. **The items of damage or injuries claimed are:** Claimant WESLEY MARTIN sustained severe personal injuries, the full extent of which is not presently known, including but not limited to severe emotional agitation from being denied his medication, severe humiliation and anxiety and embarrassment as a result of this incident. Claimant felt grave fear and intimidation for his freedom and well being by virtue of the intentional, deliberate and malicious acts of the officers. Claimant was deprived of freedom and liberty, was falsely arrested and imprisoned for a period of time of about 33 hours. Claimant was also forced to retain counsel and incur legal expenses in order to defend himself against false charges and be deprived of liberty and suffer anxiety as a result of the malicious prosecution commenced and continued by the COUNTY OF NASSAU, THE NASSAU COUNTY POLICE DEPARTMENT AND DETECTIVE CHARLES DE CARO its agents, servants and employees, against claimant until all charges were dismissed on June 21, 2007. All the above has resulted in pain, suffering, anxiety and emotional harm, costs for legal representation and other damages to which claimant is entitled to by case law and statute.

Said claim and demand is hereby presented for adjustment and payment. You are hereby notified that unless they are adjusted and

paid within the time provided by law from the date of presentation to you, the claimant intends to commence an action in these claims. Claim is made for personal injuries not to exceed the sum of TWO MILLION ($2,000,000.00) DOLLARS and punitive damages, to the extent available, not to exceed the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

Dated: ~~Southampton,~~ Rosyln Heights, New York
August 21, 2007

Wesley Martin
WESLEY MARTIN

**INDIVIDUAL VERIFICATION**

*State of New York, County of New York SS:*

WESLEY MARTIN

being duly sworn, deposes and says that deponent is the claimant in the within action; that (s)he has read the foregoing Notice of Claim and knows the contents thereof; and that as to those matters deponent believes it to be true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true.

*Sworn to before me, this* 21st
*Day of* August *2007*

NOTARY PUBLIC

ROSEMARIE CAVERA
Notary Public, State of New York
No. 02CA6074732
Qualified in New York County
Commission Expires May 20, 2010